[S. F. No. 17997. In Bank. July 6, 1951.]

ANNA BLACHE, Plaintiff and Appellant, v. MAURICE J. BLACHE et al., Defendants and Appellants.

David Livingston and Louis F. DiResta for Plaintiff and Appellant.

Ernest J. Torregano for Defendant and Appellant Maurice J. Blache.

Edward J. Lynch for Defendant and Appellant Jeanne C. Pedebidou.

SCHAUER, J.—Plaintiff Anna Blache brought this action for separate maintenance and determination of property rights against her husband Maurice and against Jeanne Blache, with whom Maurice had gone through a marriage ceremony and lived in the mistaken belief that he had divorced plaintiff. Each of the defendants appeals from a judgment which decrees, among other things, that Maurice pay Anna separate maintenance and that a half interest in described properties accumulated by Maurice and Jeanne is community property of Maurice and Anna. Anna appeals from the judgment insofar as it fails to grant her additional relief which she contends should have been awarded her. The trial which resulted in this judgment was the second trial of this case. Anna did not testify at such second trial; rather, over objection, she was allowed to rest her case principally upon a transcript of her testimony at the first trial. Such testimony on its face appears to be evasive and self-contradictory. Essential findings of the trial court favorable to Anna are based solely upon this transcribed testimony. For reasons hereinafter more particularly set forth, we have concluded that this procedure was prejudicially erroneous.

Anna and Maurice were married in 1912 and separated in 1914. In 1916 Maurice sued for divorce on the ground of desertion. Anna was personally served and, in letters to Maurice's counsel written both before and after the case came on for trial, she repeatedly expressed consent to the divorce and urged that it be speedily obtained. Her default was entered in July, 1916. The case came on for trial in January, 1917; evidence was taken and the trial court suggested additional corroboration; Maurice's attorney stated that he would obtain a corroborating deposition; the cause was continued to October 24, 1917; on that date there was no appearance and the cause went off calendar. The proposed deposition was taken (in the state of Michigan) and was filed on March 11, 1918, but it appears that the cause was never restored to the calendar, that the additional evidence did not come to the trial court's attention, and that no judgment was rendered. Maurice believed that the divorce had been granted. In 1939, after the present action was instituted, Maurice's divorce action was dismissed of the court's own motion.

In 1918 Maurice went through a marriage ceremony with Jeanne; he did not tell her of his prior marriage or his belief that he had been divorced. Maurice had no property at this time; Jeanne contributed about $10,000 of her own property to their mutual endeavors; and over a period of 20 years they accumulated property worth more than $150,000.

Between 1915 and 1932, neither Maurice nor Anna knew anything of the other's whereabouts or activities. In 1932 Anna learned that Maurice was in San Francisco. She wrote to him that she was attempting to obtain a passport for a proposed trip abroad and that for this reason she needed a certified copy of the divorce decree; she asked him to send her such copy or tell her where one could be obtained. When Maurice attempted to obtain a copy of the decree he learned and advised Anna that they were not divorced. Thereafter, until 1938, Maurice and Anna corresponded; Anna repeatedly wrote that she did not desire to obtain money from him or to cause him trouble; she suggested that he dissolve their marriage and validly remarry Jeanne. In 1938 Anna saw Maurice for the first time since their separation in 1914. Later in 1938 she demanded money and threatened legal action. In May, 1939, Maurice for the first time told Jeanne of his prior marriage to Anna. In June, 1939, Anna instituted the present action. As grounds for separate maintenance she alleged

desertion, adultery and wilful neglect. Among the defenses raised by Jeanne and Maurice were the following: laches; estoppel; an agreement betweeen Maurice and Anna, made when they separated, that they would live apart, that each would support himself, and that any property which either might accumulate would be separate property of that person; the provisions of section 124 of the Civil Code that ''A divorce must be denied: One. When the cause is adultery and the action is not commenced within two years after the commission of the act of adultery, or after its discovery by the injured party . . . Three. In all other cases when there is an unreasonable lapse of time before the commencement of the action.'' Maurice also cross-complained for divorce and for annulment.

On the first trial of this action the trial court made no finding which would have supported an award of separate maintenance, and no award of such maintenance; it awarded Anna $7,989.13 and ordered that on payment of the judgment Anna should have no further interest in ''any community property.'' The judgment was not supported by the findings and was not authorized by sections 137 and 146 of the Civil Code, which govern the disposition of separate maintenance actions.[1] For these reasons it was reversed by the District Court of Appeal in *Blache* v. *Blache* (1945), 69 Cal.App.2d 616 [160 P.2d 136].

As previously stated, on the second trial of this action Anna, the plaintiff, did not testify. Instead, over objections of both defendants, a transcript of her testimony at the first trial was read into the record. This was done without any attempt to show that she was not available to testify. The trial court permitted this procedure because of a misinterpretation of the following statement in the opinion of the District Court of Appeal on the prior appeal (p. 631 of 69 Cal.App.

---

[1]Section 137 provides in material part that ''When the husband . . . wilfully deserts [or wilfully fails to provide for] the wife . . ., or when the . . . wife has any cause of action for divorce . . ., she may, without applying for divorce, maintain . . . an action . . . for permanent support and maintenance. . . . The court, in granting . . . permanent support and maintenance . . . shall make the same disposition of the community property and of the homestead, if any, as would have been made if the marriage had been dissolved . . .'' The code does not provide for a division of community property in such action in the absence of an award of separate maintenance.

Section 146 provides in material part that ''If the decree be rendered on any other ground than that of adultery, incurable insanity or extreme cruelty, the community property shall be equally divided between the parties.''

2d): "Whether the factual questions on a new trial should be submitted on the same record, or whether new or additional evidence should be presented, is a question to be decided by the trial court and the respective attorneys." Plaintiff's attorney urges that this statement means that he could submit plaintiff's case upon the record of the previous trial without the consent and over the objection of the attorneys for the defendants. In this he is mistaken. Under his interpretation, the District Court of Appeal made a misstatement of law, whereas the natural and reasonable meaning of its statement, which is in accord with law, is that the factual questions could be submitted on the record of the prior trial if the attorneys for *all* the parties *and* the trial judge agreed. ■ It is established by both statute and judicial decision that in the absence of agreement by the attorneys (or by the parties if not represented by counsel), such use of the evidence at a former trial may be permitted only if the witness' testimony in court cannot be produced. (Code Civ. Proc., § 1870, subd. 8; *Kuck* v. *Raftery* (1931), 117 Cal.App. 755, 761 [4 P.2d 552]; *Van Orden* v. *Anderson* (1932), 122 Cal.App. 132, 144 [9 P.2d 572]; *Kuehn* v. *Don Carlos* (1939), 32 Cal.App.2d 295, 297 [89 P.2d 672]; *Gordon* v. *Nichols* (1948), 86 Cal. App.2d 571, 576 [195 P.2d 444]; 5 Wigmore, Evidence (3d ed.), § 1415, p. 191.)

The seriousness of the trial court's error is apparent when we consider the reasons for the requirement that the witness, if available, take the stand. Not only can the credibility of the witness on the stand be tested by cross-examination; another purpose is served by the requirement of the witness' presence: the trier of fact can "obtain the elusive and incommunicable evidence of a *witness' deportment while testifying*." (5 Wigmore, op. cit., pp. 125-126.) Wigmore states that "No one has ever doubted that the *former testimony* of a witness cannot be used if the witness is *still available* for the purpose of testifying at the present trial." (5 Wigmore, op. cit., p. 191.)

As was aptly stated by the District Court of Appeal after the first trial of this case, "On appeal we cannot evaluate the truth of the testimony from the manner and demeanor of the witnesses. There appear enough contradictory and inconsistent statements in the transcript of the testimony of each of the three principal parties to justify this court in sustaining a finding contrary to the testimony of any one of the parties." (*Blache* v. *Blache* (1945), *supra*, 69 Cal.App.2d

616, 624-625.) The judge who tried the case the second time was no better qualified than was the appellate court to evaluate the truth of vague, evasive and self-contradictory testimony of a witness whom he had not observed.[2]

On the question of probable prejudice from the error it is significant that the judge who tried the case on the second trial, and who did not see and hear Anna, took a favorable view of her claim, whereas the judge who tried the case on the first trial, and who observed her, took a substantially unfavorable view of such claim, as is manifest from the substantial difference between the two judgments. Maurice and Jeanne took the stand on the second trial. The fact that their testimonies at both trials, like that of Anna at the first trial,

---

[2]Illustrations of issues on which the trial court found for Anna, and on which her demeanor on the stand could have an important effect, include the following:

The court found that Maurice wilfully deserted Anna in 1914. Evidence which would have supported a contrary finding includes her default in 1916, after personal service, in Maurice's divorce action, wherein he alleged that Anna deserted him; letters written by Anna in 1917 which manifested consent to, and eagerness for, Maurice's obtaining the divorce; and, if believed, the testimony of Maurice. Anna's only explanation of her consent to a separation and her admission (by default) that she deserted Maurice is found in the transcription of her testimony read into evidence. She testified that she expressed consent because she was "upset," "didn't realize what I was doing" and "I knew that no matter what I wrote, that wouldn't make any difference."

The trial court found for Anna on the issue of wilful neglect. But "A husband abandoned by his wife is not liable for her support until she offers to return, unless she was justified, by his misconduct, in abandoning him; nor is he liable for her support when she is living separate from him, by agreement, unless such support is stipulated in the agreement." (Civ. Code, § 175.) Anna's transcribed testimony concerned the questions of abandonment, Maurice's conduct, and the asserted 1914 agreement to live separate; all these questions are material to a determination whether Maurice's conduct constituted wilful neglect and whether any of the property acquired by Maurice and Jeanne can be held to have become impressed with a community interest in favor of Anna.

The court found, contrary to Maurice's testimony, that Anna and Maurice did not agree in 1914 that they would separate, that each would support himself, and that the earnings of each would be his separate property. The only evidence contradicting Maurice's testimony was the transcribed and self-conflicting testimony of Anna; her actual conduct from 1916 to 1938 would seem to corroborate him.

The court determined that Anna's conduct during the period between 1932, when she learned of the purported marriage of Jeanne, and 1938, did not preclude her from maintaining this action. This conduct included the writing of the reassuring letters to Maurice which contained statements that Anna would not seek money from him, urging him to divorce her and marry Jeanne, etc. Anna's transcribed testimony purporting to explain these letters contains contradictions, uncertainties, and admissions that statements therein were not true; appraisal of the weight and effect of this testimony could be greatly aided by the opportunity to observe her demeanor.

appear to be in some respects evasive and unsatisfactory, serves but to emphasize the need for the trier of fact to observe the demeanor of all and to avail himself òf every legitimate aid in resolving the conflicting factual issues.

The trial court from time to time during the second trial expressed the mistaken view that the only questions before it were (1) the amount of maintenance to which Anna was entitled; (2) whether the property described in the judgment on the first trial was the sole property of Jeanne, or whether one half belonged to Maurice and Anna as community property. And it incorrectly determined that ''The issues presented by Maurice's cross-complaint for divorce and annulment were disposed of at the previous trial of this case, and the decision at said trial on said issues is embodied in . . . the Findings of Fact. . . . Maurice did not appeal from the judgment entered pursuant to said findings, and said decision upon said issues became final.'' It should be noted that, although on the first trial the court made findings against Maurice on the issues raised under his cross-complaint, it did not expressly decree that he was not entitled to relief thereunder, nor that Anna was entitled to separate maintenance; indeed, there is nothing in the judgment to show that the status of Maurice and Anna as husband and wife, or Anna's right to separate maintenance, was ever in issue.

The order of the District Court of Appeal purportedly affirmed ''the portions of the judgment adjudicating Maurice's ownership of one-half of·the real and personal property, and vacating and setting aside certain transfers of his interests in such properties to Jeanne''; ''in other respects [except as to an award of attorney's fees which is not here material] the judgment is reversed'' (p. 633 of 69 Cal.App.2d). The trial court did not expressly or at all adjudicate ''Maurice's ownership of one-half of the real and personal property.'' The purported and inadvertent affirmance of a nonexistent portion of the judgment had no effect. As is clearly apparent upon analysis of the judgment, and as is stated in the summary of the original District Court of Appeal decision by the reporter of decisions (p. 618 of 69 Cal.App.2d) and by the District Court of Appeal, itself, in a subsequent opinion on an appeal from an intermediate order (*Blache* v. *Blache* (1947), 78 Cal.App.2d 168, 170 [177 P.2d 345]), the original judgment of the appellate court amounted to a straight reversal of the trial court's judgment except as to attorney's fees.

The reversal by the District Court of Appeal set at large, and our reversal here will set at large, every issue in the case, including the issues raised under the cross-complaint of Maurice. (See *De Hart* v. *Allen* (1945), 26 Cal.2d 829, 833 [161 P.2d 453].) ■ It is true that there are cases which hold that a judgment becomes final as against a nonappealing party even though the judgment is reversed on the appeal of other parties. (*G. Ganahl Lumber Co.* v. *Weinsveig* (1914), 168 Cal. 664, 667 [143 P. 1025]; *Lake* v. *Superior Court* (1921), 187 Cal. 116, 119 [200 P. 1041]; *Smith* v. *Anglo-California Trust Co.* (1928), 205 Cal. 496, 505 [271 P. 898]; *Neil* v. *Five C. Refining Co.* (1947), 79 Cal.App.2d 191, 194 [179· P.2d 818].) But this rule is not applied where portions of a judgment adverse to a nonappealing party are so interwoven with the whole that appeal from a part affects the other parts; in such a situation the appellate court can reverse the entire judgment if it is necessary to do justice. (*Estate of Murphey* (1936), 7 Cal.2d 712, 717 [62 P.2d 374]; *Whalen* v. *Smith* (1912), 163 Cal. 360, 362 [125 P. 904, Ann.Cas. 1913E 1319].) The issues raised under the cross-complaint are not merely interwoven with, but in substantial part are identical with, the issues raised under the complaint.

For the reasons above stated the judgment is reversed and the cause remanded for a new trial.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., and Traynor, J., concurred.

Plaintiff and appellant's petition for a rehearing was denied August 2, 1951.