[Civ. No. 8689.   Third Dist.   May 31, 1956.]

Estate of HARRY C. STAUFFER, Deceased. R. N. PHIL-
POT et al., Appellants, v. MYRA STAUFFER HENRY
et al., Respondents.

Lewis, Lewis & Lewis, Pierce & Brown, A. M. Mull, Jr., and Wilke & Fleury for Appellants.

Anthony J. Kennedy and Devlin, Diepenbrock & Wulff for Respondents.

PEEK, J.—At the conclusion of a contest instituted by the heirs at law of the decedent, Harry C. Stauffer, the court by its judgment denied probate of the will offered by the proponents, R. N. Philpot and Hilda Kirtlan, except as to two items thereof. Proponents' motion for a new trial was denied, and this appeal followed.

A summary of the pertinent facts as shown by the rather voluminous record indicates that on March 25, 1944, eight years prior to his death and when he was approximately 68 years of age, the decedent, Harry C. Stauffer, executed the will in question. He was one of a large family; however, at the time of his death he was survived by only one sister, Myra S. Henry, aged 87, one of the contestants, and by numerous nieces and nephews, three of whom are also contestants herein. None of these relatives had any contact with Harry for more than 15 years prior to his death, and at the time thereof in January of 1952, none of them attended the funeral or recognized his death in any way. He had been married and divorced, and his one son of that marriage had predeceased him. He was a graduate pharmacist and had at one time operated a pharmacy in Sacramento. From 1916, when he disposed of his pharmacy, until 1929 he lived with a friend in the Fair Oaks district, a suburban Sacramento area, and worked at odd jobs for his friend. In 1921 he suffered a stroke which left him slightly disabled. In 1929 he was employed as a night watchman, but he had no regular work thereafter. In 1934 he returned to his mother's home in Sacramento where he lived with her and his unmarried

sister, Ida. This home which was an old style, three-story mansion had been used by the family for a long period of time and was across the street from the real estate office of one of the proponents and appellants herein, R. N. Philpot. From approximately 1931 Philpot, at the request of the mother, handled all of the Stauffer family affairs.

In the middle thirties, following a request from the mother for advice and assistance in her affairs, Philpot suggested that the home be razed and a store and office building be erected on the site. Through his efforts such a project was ultimately financed and completed in 1938 and 1939. A new home was purchased and Ida and Harry lived there until her death. Shortly after Harry executed the will in question this house was sold, and from then on he lived by himself until his death in 1952. During all of this time, as the trial judge noted in his memorandum opinion, Philpot attended to all business matters pertaining to the property. He prepared the deed by which the mother transferred title of that property to Harry's sister, Lillie; also the deed by which Lillie transferred the same to the sister, Ida; and the deed by which Harry took title from Ida. All of these deeds were kept by Philpot in his office and subsequently he had them recorded. He negotiated loans, employed contractors, secured tenants, prepared leases and all documents necessary to the accomplishing of these purposes.

Although the record contains no evidence as to the value of the property at the time the will was executed, it does appear that largely through Philpot's efforts the value of the property rose from approximately $25,000 in the early 1930s to approximately $120,000 in 1949. All of the funds received from rentals and other sources which belonged to the Stauffer family were placed in a personal bank account maintained by Philpot, and all funds disbursed for the benefit of the Stauffers were paid by Philpot out of this account. The appellant Hilda Kirtlan, who was Philpot's longtime secretary, personally kept the various accounts involved. Following Ida's death, Philpot continued his management of the Stauffer family affairs. There was evidence that during this entire time Harry drank quite heavily and took no responsibility whatsoever for his estate, allowing Philpot the complete management and control thereof. In addition he had Harry's power of attorney.

At the time of the execution of Harry's will, his estate consisted of the property in question which was rented for a

term of years at the rate of $761 per month with some additional funds received as rental for an adjacent parking area; and, prior to the sale of the 34th street residential property, a further sum of $25 per month was received as rent for a small house on the rear of the lot. There were dividends which Harry collected on some stock; and his son had been paying $35 per month to Philpot for his father's support. This stopped upon the death of the son, but in the meantime the rental on the store building had increased to $1,845 per month and the parking lot to $125 per month. Against this were the disbursements necessary for payment on the $45,000 loan against the property and the attendant expenses such as taxes and utilities. During the year prior to the execution of the will Harry received an average of $124 monthly which he obtained in small amounts by calling twice a week at Philpot's office.

On November 10, 1938, Ida gave Philpot a deed to certain grazing land in Glenn County which, according to Philpot, he subsequently sold for $500. In September of 1942 Ida also gave Philpot a promissory note secured by a second deed of trust on the Sacramento property in the sum of $23,000 with interest compounded at the rate of 6 per cent per annum. According to Philpot this note and deed of trust were given to him at Ida's suggestion because, as she stated, she had no money and desired to make payment for his services to the family during her lifetime for which he had received no compensation.

By the terms of his will, decedent devised, in Item 2, to Jessie Snyder, certain improved real property (the 34th street property which was sold prior to his death) "For kindnesses shown me during my life . . ." By Item 3 he devised to Philpot and Kirtlan the improved business property, "For services rendered to me and to my family for the past fifteen years, for which no compensation has been paid to them, and for kindnesses shown to me during my lifetime . . ." By Item 4 he gave to Michael David Littlefield, a minor, the sum of $5,000 to be placed in trust with Philpot and to be handled and invested by him until David reached his majority. By Item 5 he gave to certain named relatives the sum of $5.00 each. By Item 6 it was provided that if there was "sufficient revenue from the estate to warrant" it, $50 should be paid monthly to his sister, Myra S. Henry. Lastly by Item 7, he provided that all of the residue of his estate should be "divided share and share alike" among Phil-

pot, Snyder and Gladys Wollenberg, his former daughter-in-law. He also named Philpot as executor without bond.

According to Philpot, the evidence concerning the circumstances surrounding the execution of the will was that several months prior thereto Harry called at Philpot's office saying that he desired to make his will; that he knew about the $23,000 note; and that Philpot told him if he would tell Miss Kirtlan what he wanted, she would type it for him. This was corroborated by Kirtlan who stated he had also talked with her; that thereafter he came to the office with a draft of a will which he had prepared in his own handwriting; that she thereupon typed the will, merely copying from the draft which Harry had given her; and that following the execution of the will Harry took the original draft with him, leaving the executed will with Philpot. The court noted in particular the similarity between Harry's will and that of Ida which Kirtlan had likewise typed and acknowledged in 1938. Excepting the dispositive clauses, the two wills were practically duplicates as the trial court stated, "word for word, phrase for phrase, and clause for clause. Even the spacing and punctuation are identical, including the odd manner of putting the initials of Philpot ("R". "N".) in quotation marks."

In discussing the question of undue influence, the trial court noted that the evidence clearly established the existence of a confidential relationship between Harry and Philpot which was admitted by all parties, and therefore the activity of Philpot and Kirtlan in the preparation of the will and the undue profits which the will granted to them raised a presumption of undue influence and cast upon the proponents the burden of dispelling the same. To overcome this presumption Philpot and Kirtlan contend that the provisions of the will are not unnatural in that Harry had an abiding dislike for his relatives, and hence it was quite natural for him to reward the only persons who had been helpful to him; that the evidence of undue profit is at best only conjectural since there was no evidence as to the value of the property at the time the will was executed; that while there may have been opportunity for Philpot and Kirtlan to control Harry's testamentary act, that fact standing alone, unless coupled with a showing of activity on their part was insufficient; and that there was no evidence as to Harry's susceptibility to influence or subversion—in fact it was all to the contrary, and the court specifically noted this characteristic. In summation of the above-mentioned evidence, the

trial court, in its memorandum opinion, further noted that were it not for the circumstances surrounding the execution of the will, this would be a "close case on the facts," but such circumstances were "so incredible that it destroys the favorable effect of their other testimony."

Although the case made out by the contestants was not a strong one, we are constrained to agree on this point with the conclusion of the trial court. The long control of management of Harry's affairs by Philpot, the participation of proponents in the actual preparation of the will and the gift to them, in effect, of his entire estate for the specific reason that it was for services rendered to himself and his family for which Philpot had received no compensation, when in fact less than two years before Ida had given Philpot a note and trust deed in the sum of $23,000, and the bequest of $50 a month to Myra if there was "sufficient revenue . . . to warrant" it, were sufficient to present a substantial conflict in the evidence as to the true state of his knowledge of his affairs and as to the undue influence, if any, on the part of proponents, and hence to support the conclusion of the trial court thereon. (*Estate of Pellegrini,* 138 Cal.App.2d 143 [291 P.2d 558].)

APPEAL OF GLADYS WOLLENBERG

As previously noted, Item 7 of the will gave the residue of the estate to R. N. Philpot, Jessie Snyder and Gladys Wollenberg, share and share alike. The court found that this item could not be separated from the portions of the will affected by the undue influence of Philpot; that to eliminate Philpot therefrom would be to make a will for the decedent which did not express his intent. The court further found that at the time of the execution of the will Harry owned no property which would be disposed of by the residuary clause if the portions of the will affected by the undue influence were admitted to probate.

In discussing the various rules for the interpretation and construction of wills as found in the Probate Code and court opinions, our Supreme Court has held in *Estate of Lefranc,* 38 Cal.2d 289, 295-296 [239 P.2d 617], that:

"A 'will is to be construed according to the intention of the testator. Where his intention cannot have effect to its full extent, it must have effect as far as possible.' (Prob. Code, § 101.) 'The words of a will are to receive an interpretation which will give to every expression some effect, rather than one which will render any of the expressions

inoperative; and of two modes of interpreting a will, that is to be preferred which will prevent a total intestacy.' (Prob. Code, § 102.) (See also *Estate of Phelps* (1920), 182 Cal. 752 [190 P. 17]; *Estate of McCurdy* (1925), 197 Cal. 276, 282 [240 P. 498].) All 'the parts of a will are to be construed in relation to each other, and so as, if possible, to form one consistent whole; but where several parts are absolutely irreconcilable, the latter must prevail.' (Prob. Code, § 103.) 'A clear and distinct devise or bequest cannot be affected by any reasons assigned therefor, or by any other words not equally clear and distinct, or by inference or argument from other parts of the will, or by an inaccurate recital of or reference to its contents in another part of the will.' (Prob. Code, § 104.) 'A devise of the residue of the testator's personal property, passes all the real or personal property, as the case may be, which he was entitled to devise or bequeath at the time of his death, not otherwise effectually devised or bequeathed by his will.' (Prob. Code, § 126.) 'The making of a will raises a presumption that the testator intended to dispose of all his property. Residuary clauses are generally inserted for the purpose of making that disposition complete, and these clauses are always to receive a broad and liberal interpretation, with a view of preventing intestacy as to any portion of the estate of the testator, and this general rule is in harmony with the declaration of our code that the provisions of a will must be construed, if possible, so as to effect that purpose.' (*O'Connor* v. *Murphy* (1905), 147 Cal. 148, 153 [81 P. 406]; see also *Estate of Beldon* (1938), 11 Cal.2d 108, 112 [77 P.2d 1052].) The prevailing principle is that the function of the court is to construe a will, not to make one; to ascertain the testator's intention as expressed and, *if lawful, give it effect.*'' (Emphasis added.)

While it is true that if the entire will is the result of undue influence, probate of the same must be refused, nevertheless, ''[i]f only a part of it is affected by undue influence, that part may be rejected as void, but the remainder, which is the outcome of the free action of the testator, ought to be sustained if it is not inconsistent and can be separated from the part which is invalid, and should be admitted to probate.'' (*Estate of Webster*, 43 Cal.App.2d 6, 15 [110 P.2d 81, 111 P.2d 355].)

Applying the rules noted in the cited cases to the present one, the only evidence as to participation related to Philpot and Kirtlan. As to the remaining parties named in Item 7,

Snyder and Wollenberg, there is absolutely no evidence of any kind relative to any activity by them in procuring the execution of the will. The court specifically found this to be true as regards Snyder. No finding, however, was made concerning Wollenberg; in fact her name is not even mentioned in the exhaustive memorandum opinion filed by the court. Furthermore, with the exception of his feeling towards Snyder as expressed in his will and toward his former daughter-in-law Wollenberg, as shown by the evidence, the record is devoid of any evidence of any love or affection between the testator and his relatives. In fact it was all to the contrary. Under such facts and circumstances it cannot be said that the presumption of undue influence or any of the specific activities on the part of Philpot so affected the interests of Snyder and Wollenberg that it is impossible to determine to what extent their legacies were tainted with this undue influence. So far as Snyder and Wollenberg are concerned, ". . . their situation is that the [testator] died leaving behind [him] a duly executed instrument expressing [his] testamentary wishes in their favor unaffected by undue influence, fraud, or other vitiating circumstance. This means nothing more or less than that the will is perfectly valid as to them. The result is that it is only the portions of the will in favor of [Philpot which] . . . should be revoked, the remaining portions continuing as a valid expression of the [testator's] testamentary intention." (*Estate of Carson*, 184 Cal. 437, 441 [194 P. 5, 17 A.L.R. 239].)

The statutory rules of construction as noted in the Lefranc case and the summation thereof are that the function of the court is to construe a will—not to make one; to ascertain the testator's intention as expressed, and give it effect, which construction may mean as noted in the Webster and Carson cases, the acceptance of part and rejection of the remainder. But contrary thereto and even to the general thought expressed in the trial court's memorandum opinion, the effect of its conclusion was to defeat any possibility of carrying out, except as to minor bequests, the testator's intention. This is true since the judgment of the trial court excluded both Snyder and Wollenberg, the only two beneficiaries for whom he was shown to have expressed any affection, except Littlefield, and thereby gave substantially all of his estate to the very persons whose participation he emphatically did not want. We cannot agree with such result.

The further contention that the residuary clause must fail

because Harry was possessed of no property which would be disposed of by his will, should the portions affected by undue influence have been admitted to probate, is also without merit. By the terms of section 126 of the Probate Code, one who makes residuary disposition of his estate either real or personal, passes all of such property "not otherwise effectually devised or bequeathed by his will." Necessarily, therefore, property not effectually devised, such as in the present case, would pass to the beneficiaries named in the residuary clause. Thus it has been held that in the absence of a contrary intent clearly expressed by the terms of the will, "the accepted rule in this state [is] that where there is a valid general residuary devise real property mentioned in a lapsed or void devise goes to the residuary devisee . . ." (*Estate of Russell,* 150 Cal. 604, 605 [89 P. 345].)

Although we believe the rules above enunciated to be controlling in relation to the questions raised concerning the residuary clause of the will here in dispute, we have been referred to no California case wherein a comparable factual situation was presented or wherein this specific point was at issue. However, in *Wellman* v. *Carter,* 286 Mass. 237 [190 N.E. 493, 498], it was held that a separate, distinct and independent residuary clause would stand even though bequests to some persons named therein were procured by undue influence, and although the residuary clause might thereby be increased in value beyond what was contemplated by the decedent at the time of the execution of the will, such circumstances were immaterial. This we believe to be the proper rule.

It should further be noted that the conclusion we have reached concerning the construction of the residuary clause will redound to the benefit of Jessie Snyder who did not appeal as well as Gladys Wollenberg who did, under the rule enunciated in the case of *Blache* v. *Blache,* 37 Cal.2d 531 [233 P.2d 547], wherein the court expressly held:

"It is true that there are cases which hold that a judgment becomes final as against a nonappealing party even though the judgment is reversed on the appeal of other parties. [Citing cases.] But this rule is not applied where portions of a judgment adverse to a nonappealing party are so interwoven with the whole that appeal from a part affects the other parts; in such a situation the appellate court can reverse the entire judgment if it is necessary to do justice." (P. 538.)

The conclusion we have reached herein necessarily invokes the further rule that where the gift is to certain named individuals, and the share they each are to receive is specifically mentioned, they take individually as tenants in common. Thus when one of such designated persons dies or, as in the present case, is precluded from taking his designated share, then as to that share the testator died intestate, and such portion is vested in his heirs at law. (*Estate of Murphy*, 157 Cal. 63 [106 P. 230, 137 Am.St.Rep. 110] ; *Estate of Kelleher*, 205 Cal. 757 [272 P. 1060].)

By reason of the conclusions herein set forth, the judgment of the trial court as it relates to appellants Philpot and Kirtlan is affirmed. The judgment as it relates to the devisee Snyder and the appellant Wollenberg is reversed, and the cause is remanded to the trial court with instructions to enter judgment in accordance with the views herein expressed.

McMurray, J. pro tem.,* concurred.

SCHOTTKY, Concurring and Dissenting.—I concur in the part of the majority opinion which affirms the judgment as it relates to appellants Philpot and Kirtlan, but am unable to agree with the opinion of the majority that the judgment should be reversed as it relates to appellant Wollenberg and devisee Snyder. I shall therefore set forth my views as to the appeal of Gladys Wollenberg.

Item (7) of the will gave the residue to appellant Philpot, Jessie Snyder and appellant Wollenberg, and the court found that said Item (7) could not be separated from the portions of the will affected by said undue influence without making a will that did not express Harry Stauffer's intent. The court found also that at the time the will was executed Harry S. Stauffer owned no property which would be disposed of by said residuary clause if the portions of the will affected by undue influence (the devise of the 14th and I Street property to appellants Philpot and Kirtlan) were admitted to probate.

Appellant Wollenberg contends that the undue influence of appellants Philpot and Kirtlan does not invalidate the residuary gift as to the two innocent residuary beneficiaries, herself and Jessie Snyder. In her brief she argues that because undue influence invalidated appellant Philpot's portion of the residue, she is entitled to one-half thereof instead of one-third, but upon the oral argument her counsel conceded

---

*Assigned by Chairman of Judicial Council.

that she would be entitled only to one-third of the residue.

Appellant Wollenberg points out that there was no evidence or finding that any undue influence or any other wrong was, in any way, indulged in by either Jessie Snyder or Gladys Wollenberg. The evidence establishes that appellant Wollenberg married the son of decedent in 1926. They were divorced some three years later and during the marriage she had occasion to visit with the Sacramento Stauffer family, including her father-in-law, the decedent, two or three times weekly. There was evidence that after the divorce these reciprocal visits were continued. After Ida's death and up to "around 1950" decedent continued to visit Gladys at her home. The decedent was fond of her two sons. Said appellant points out that on the other hand the feeling existing between the Stauffer family and the Henry family was very distant. The last times any of the Henry family had ever seen any of the Stauffers were in 1935 and 1937. Even then they did not see decedent.

The general rule as to partial invalidity is well expressed in 57 American Jurisprudence, section 366, page 266, as follows:

"While there are authorities which hold that where the execution of a will is shown to be the result of undue influence, the issue is upon the validity of the will as a whole, and testimony which defeats one devise or one legacy defeats all, the general rule is that parts of a will may be held valid notwithstanding other parts are invalid on account of undue influence exercised upon the testator, provided the parts so affected are separable so that the will remains intelligible in itself if the invalid parts are deleted upon probate. In other words, the valid portions of the will may stand and be admitted to probate, although other parts are denied probate, or are set aside, as obtained through undue influence, unless the provisions are so interdependent that the valid cannot be separated from the invalid without defeating the general intent of the testator. . . .

"The general rule as stated above is subject to the limitation that it is not applicable when it will defeat the manifest intent of the testator, interfere with the general scheme of distribution, or work an injustice to other heirs. The doctrine is not applicable where it is impossible to determine to what extent specific legacies have been tainted by the undue influence; in such a situation the whole will must either be refused probate or admitted thereto."

Appellant Wollenberg cites section 102 of the Probate Code to the effect that an interpretation of a will which will prevent intestacy is preferred, and also quotes from *Estate of Webster*, 43 Cal.App.2d 6, at page 15 [110 P.2d 81, 111 P.2d 355], as follows:

"The general rule is that if the whole will is the result of the presence of undue influence, probate of the whole will must be refused. If only a part of it is affected by undue influence, that part may be rejected as void, but the remainder, which is the outcome of the free action of the testator, ought to be sustained if it is not inconsistent and can be separated from the part which is invalid, and should be admitted to probate. [Citing cases.]"

Said appellant also cites *Estate of Carson*, 184 Cal. 437 [194 P. 5, 17 A.L.R. 239], as holding that a will induced by false representations of the residuary legatee is valid as to the bequests to others in the absence of any showing that such bequests were affected by the representations.

As set forth in the majority opinion, the court found that the will was not the free and voluntary act of Harry C. Stauffer but was the product of the undue influence of appellants Philpot and Kirtlan except as to a bequest of $5,000 to Michael David Littlefield and a devise of certain real property to Jessie Snyder (which property was sold before Harry C. Stauffer's death, causing said devise to lapse). Appellant Wollenberg argues that "The result of the trial court's decision is to create an intestacy and thus pass the bulk of decedent's estate to the very heirs who were, in effect, disinherited by him and for whom he had no affection or regard." But, as pointed out by respondents, and found by the court, Harry Stauffer owned no property at the time the will was executed which would be disposed of by the residuary clause, and if said clause were permitted to stand as to appellant Wollenberg she would be receiving part of the property which was specifically devised to appellants Philpot and Kirtlan. Furthermore, it is not possible to determine to what extent the undue influence of appellants Philpot and Kirtlan caused the virtual disinheritance of all of the blood relatives of Harry Stauffer other than Myra Henry.

I believe that the trial court's findings that the residuary clause could not be separated from the portions of the will affected by undue influence and that striking the name of appellant Philpot from said residuary clause and permitting the remainder to stand would be to make a will for Harry

Stauffer find support in the record. I believe that the instant case comes within the exception to the general rule of partial invalidity, hereinbefore quoted, that "the doctrine is not applicable where it is impossible to determine to what extent specific legacies have been tainted by the undue influence."

I would affirm the judgment in its entirety.

Petitions for a rehearing were denied June 22, 1956, and the petitions of appellants R. N. Philpot and Hilda Kirtlan and of respondents Myra Stauffer Henry, Edna Dyer, Alice Stauffer Taylor and Marjorie Stauffer for a hearing by the Supreme Court were denied July 24, 1956.