138 Cal.App.2d 143 (1955)
Estate of JOSEPH PELLEGRINI, Deceased. ARMENIA ANDREOZZI, Respondent,
v.
BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a Corporation), as Executor, et al., Appellants.
Civ. No. 16563. 
California Court of Appeals. First Dist., Div. One. 
Dec. 22, 1955.
 Thomas F. Poggi and H. Raymond Hall for Appellants.
 Franklin C. Stark, John F. Wells and Stark & Champlin for Respondent.
 WOOD (Fred B.), J.
 In this contest of will after probate, the jury found that Joseph Pellegrini's purported will dated January 29, 1953, was executed by him by reason of undue influence exerted over him by the proponent, Ilia Giannoni. Judgment on the verdict was entered June 22d, and an order revoking probate on August 13, 1954, from each of which the proponent, sole beneficiary under the will, and the Bank of America as executor have appealed. They question the sufficiency of the evidence to support the verdict and claim error in the giving and refusing of certain instructions.
 As to the Sufficiency of the Evidence
 Our examination of the record convinces us that there is substantial evidence that the proponent (1) sustained a confidential relationship to the testator, (2) unduly profited by the will, and (3) actively participated in procuring its execution, raising a presumption of undue influence which we cannot say as a matter of law was offset by other evidence in the case.
 Proponent does not recognize these three factors (confidential relationship, undue profiting, and active participation) *145 as furnishing a sufficient basis for the presumption. She insists upon the five factors [fn. 1] mentioned in Estate of Lombardi, 128 Cal.App.2d 606, 610-611 [276 P.2d 67], and in 26 Cal.Jur. 647, 19; or as somewhat differently expressed in Estate of Llewellyn, 83 Cal.App.2d 534, 562-563 [189 P.2d 822, 191 P.2d 419], or in Estate of Welch, 43 Cal.2d 173 [272 P.2d 512].
 Those are statements, in varying forms, of the general rule. "However, there is a well-established exception to this settled general rule, upon which respondents rely, to the effect that where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the testamentary document was not induced by coercion or fraud. When proof of the existence of a confidential relationship between the testator and such a beneficiary [one who unduly profits by the will], coupled with activity on the part of the latter in the preparation of the will, is offered, a presumption of undue influence arises therefrom." (Estate of Llewellyn, 83 Cal.App.2d 534, 561 [189 P.2d 822, 191 P.2d 419]. See also Estate of Kerr, 127 Cal.App.2d 521, 526 [274 P.2d 234].) "The rule is firmly established in California that when the contestant has shown that the proponent of a will sustains a confidential relationship toward the testator, and actively participates in procuring the execution of the will, and unduly profits thereby, the burden then shifts to the proponent to prove that the will was not induced by his undue influence. [Citations.]" (Estate of Abert, 91 Cal.App.2d 50, 58 [204 P.2d 347]. See also Estate of Leonard, 92 Cal.App.2d 420, 429 [207 P.2d 66]; Estate of Rugani, 108 Cal.App.2d 624, 629 [239 P.2d 500]; Estate of White, 128 Cal.App.2d 659, 668-669 [276 P.2d 11]; Estate of Bould, 135 Cal.App.2d 260, 275 [287 P.2d 8, 289 P.2d 15].)
 [1] There is substantial evidence that from July, 1952, when he took up residence at the home of proponent and her father, until his death on the 28th of February, 1953, a relation *146 of trust and confidence existed between the decedent and proponent. He put his savings and his commercial bank accounts in their joint names so that she could make withdrawals for him to pay her salary (he agreed to pay her $300 a month for his care), his doctor bills and his other needs. From that time on all withdrawals from the savings account and all checks on the commercial account were signed by her. He thought she knew how to take care of him better than anyone else. He wanted her to wait on him. He wanted her to do everything for him. He was dependent upon her. In addition to her personal services to him, she handled his business affairs. She admitted upon the witness stand that during that period he had the greatest trust and confidence in her, that she assumed to act in the light of that trust and confidence, and was the person who was principally in charge of his care. So far as she knew he did not have any business affairs she did not handle.
 There was substantial evidence tending to show that proponent would unduly profit by the contested will. Decedent's nearest relatives were 10 nieces and nephews, two grandnieces and one grandnephew. Of these, he appeared to be particularly fond of the contestant, Armenia Andreozzi, a niece, and of proponent, a grandniece. He had planned to spend his remaining days at the home of contestant in Chicago and took up his residence with her in the spring of 1952. But she became ill and was physically unable to give him the care he needed, at least for the time being. So, he came to live with proponent and her father in Oakland. On August 14, 1952, he made a will leaving his estate to contestant and proponent in equal shares. There is evidence that as late as the middle of February, 1953, he was looking forward to going back to Chicago and resuming his residence with contestant. Under such circumstances, it would be reasonable for the jury to infer that proponent would unduly profit by the contested will.
 Not only was proponent sole beneficiary under the will, she received from her uncle a gift of over $6,000 in November, payment of the mortgage upon her father's house, and a gift of over $2,000 in late December, 1952, or early January, 1953, payment of the purchase price of an automobile acquired in her name, each payment being made by check drawn by her upon the joint bank account. Yet, concerning the automobile there is testimony that about the middle of January she told her cousin Edward Tomei that it was not her *147 car, that she still owed payments on it, despite the fact that it was fully paid for and was registered in her name.
 There is evidence that during the last few months of decedent's life proponent exerted herself to prevent his contacting contestant and to keep the latter unaware of his declining health. In October, 1952, his doctor told proponent that her uncle's condition was serious and that death could occur then or possibly a short time thereafter, that it could happen almost any time or that life could continue for a year or two longer. From then until death came the doctor made 25 house visits. Yet, there is evidence that about the middle of February, 1953, during a phone conversation between decedent and contestant, decedent said he was sick and had asked proponent to call contestant up several times but that she would not do it, and proponent came on the phone and said he was not sick and did not know what he was talking about. Later, proponent admitted to contestant, according to the latter, that their uncle had called for contestant several times and, asked why she did not let contestant know about it, said "Oh you would have been out there about twenty times." Also, the evidence of decedent's continued deterioration and increasing senility from arteriosclerosis warranted an inference that he was susceptible to suggestion, especially by a person who sustained a confidential relationship toward him.
 It was proponent who phoned the attorney on January 29, 1953, saying that her uncle wanted to change his will that very day, that he wanted to change the other names to her name alone; also, that her uncle's hands were very shaky and he would not be able to sign his name. Although her uncle told her the first thing that morning to make this phone call, according to her testimony, she did not make the call until late morning or early afternoon and at a time when her uncle was away from the house, taking a walk in the neighborhood. Upon the occasion of the making of each of his last two previous wills (October, 1951, and August, 1952) the decedent had consulted a certain officer of the trust department of his bank who relayed the information to this attorney and attested the execution of the will when prepared. The attorney happened to be an old acquaintance of proponent.
 The attorney wrote the will and took it out to the house that evening without having talked to decedent about it. Proponent met him at the door and he went into the dining *148 room where he talked with decedent a few minutes, engaging in a general conversation. When the attorney informed decedent he had the will, the latter called the witnesses into the dining room. The attorney then read the will in English explaining it in Italian, whereupon it was executed. Proponent was present at least a portion of the time, sitting on the decedent's right, the attorney on his left. She went back and forth between the dining room and the kitchen a number of times. She heard a portion of the will read and saw the signing of it. She admitted on the witness stand that she may have been present when the portion mentioning her as sole beneficiary was read. Nobody mentioned contestant's name. No one asked decedent why he was leaving her out of this will. It would appear that the attorney did not discuss any feature of the will with decedent in private.
 Although proponent testified that she knew what was in this will and at no time since its execution had forgotten what was in it, there is evidence tending to show that she several times disavowed having such knowledge. In a phone conversation soon after decedent died, she told contestant, according to the latter, that their uncle "didn't change the will, I didn't take him down." Upon cross-examination proponent admitted she may have told contestant in substance that she did not know what was in the will but did not remember when nor whether she did so on the telephone. About two weeks after his death, in a letter to contestant, she said "I'll know what's in the will some day next week." She admitted upon cross-examination that this was an untruth. About the middle of March, 1953, she told another cousin, Edward Tomei, according to his testimony (denied by proponent), that she had not found out anything about the will, had no knowledge of it or about it, that the bank was taking care of everything. In April, 1953, contestant heard that proponent was the only person mentioned in the will and asked the latter what happened. The reply was, "I don't know, I am the only one mentioned and my lawyer says I shouldn't discuss the will."
 This evidence supports an implied finding that the three elements recognized by the exception to the general rule (confidential relationship, undue profit, and active participation) were present here and gave rise to a presumption of undue influence. We, as a reviewing court, cannot say as a matter of law that this presumption was offset by other evidence in the case. *149
 As To Instructions Given or Refused
 [2] Proponent complains because the court gave contestant's requested instructions 14, 16 and 22 as well as proponent's requested instructions 19, 20 and 26 on the subject of undue influence. We see no error in that. Proponent's instructions expressed in varying forms the general rule, whereas contestant's expressed in varying forms the exception to that rule (confidential relationship, undue profit and active participation), discussed earlier in this opinion.
 [3] Proponent additionally criticizes contestant's No. 16 because, after stating the general rule and defining the exception in the terms of the three factors mentioned, it concluded, proponent says, with a sentence indicating there are but two factors. [fn. 2] That sentence was ambiguous in mentioning but two of the three factors, leaving it to inference that "such beneficiary" as therein used meant a beneficiary who unduly profited by the will. Each of the three factors should have been mentioned in that sentence, or none of them; e.g., a statement that "in such a case, a presumption of undue influence arises" would have been free from ambiguity.
 However, we do not believe the jury could have been misled. The sentence under scrutiny immediately followed one which expressly mentioned the three factors; the instruction in which these sentences occurred, Number 16, was accompanied by contestant's Numbers 14 and 22, each of which specified the same three factors; and, when the jury later returned for further instruction on undue influence Number 16 was not again given them. When the jury returned the court reread to them contestant's Numbers 12 and 13, to which proponent takes no exception. One of the jurors asked for further elucidation, whereupon the court reread proponent's Number 19. In response to a further question by *150 a juror the court reread contestant's Number 14. [fn. 3] Thereupon, at the request of proponent's counsel, the court again read to the jury proponent's Number 26. [fn. 4] We believe the rereading of the last three instructions must have erased any impression the jury might have derived from the last sentence of contestant's No. 16 that the exception to the general rule embraces but two elements instead of three.
 Proponent further contends that by reason of the foregoing and other instructions on undue influence the court overemphasized the importance of that subject and made the jury overly conscious of undue influence. We do not so view it. There were but two issues before the jury; that of the competency of the decedent to make a will and, if competent, whether he was unduly influenced. It is apparent that the parties were impressed with the importance of the subject. Each proposed nine instructions on various phases of undue influence; all of proponent's were given and all but one of contestant's.
 [4] Proponent complains also because in several of her *151 instructions the court before giving them inserted such expressions as "and free of undue influence," or "and was not duly influenced" or "who is free of undue influence." We find no error in that. Indeed, without those interpolations the instructions in question would have been incomplete and misleading. For example, one of those instructions would have told the jury that if decedent had testamentary capacity at the time of execution of the will "you cannot invalidate his will ..." Without insertion of the words "and was free of undue influence," that instruction might have misled some members of the jury into thinking that testamentary capacity was all they had to decide.
 [5] Decedent was unable to affix his signature to the will. Accordingly, it was affixed thereto by another person at his request. Proponent requested and the court refused an instruction to the effect that if another person in the presence of a testator and at his direction subscribes the testator's name, it is a valid subscription. There was no error in such refusal. Before the case was submitted to the jury the question of due execution was withdrawn by the granting of proponent's motion for nonsuit on the count which presented that issue. Our attention has been called to nothing in the evidence or in the instructions given that might suggest to the jury a doubt as to the validity of the mode or manner of the signing of the instrument.
 [6] Proponent's instruction Number 11 explained to the jury the degree of relationship one must have to be "a natural object of bounty," mentioning nieces and nephews among those who are not so related and declaring that Armenia, the contestant, is a niece of the decedent and in no sense legally the natural object of his bounty. Proponent complains that in giving this instruction the court modified it by including Ilia, the proponent, in the same category as Armenia. Again, we see no error; indeed, it would have been unfair to the contestant and misleading to the jury to have given proponent's Number 11 without making the change of which proponent complains.
 The judgment and the order appealed from are affirmed.
 Peters, P. J., and Bray, J., concurred.
 "As a general rule, in order to set aside a will for undue influence, there must be an actual showing of some sort of pressure which overpowered the mind and mastered the volition of the testator at the very moment of the execution of the will."
 "However, there is a well-established exception to this general rule to the effect that where one who unduly profits by the will as a beneficiary thereunder, sustains the confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him or her to show the testamentary document was not induced by coercion or fraud. When proof is made of the existence of a confidential relationship between the testator and such beneficiary, coupled with activity on the part of the latter in the preparation of the will, a presumption of undue influence arises therefrom."
 "Upon the concurrence of three factors, the law recognizes a presumption of undue influence. These three factors, or circumstances are: one, where a confidential relationship existed between the decedent and the beneficiary of the will; and two, the beneficiary was active in the preparation of or in procuring the execution of the will; and three, the beneficiary would unduly profit by the terms of the will. While none of these factors and circumstances, standing alone, has the effect of creating a presumption against the validity of the instrument, their effect, in combination is to raise or create a presumption of undue influence, casting upon the proponent the burden of showing that the will was not the result of undue influence."
 "Before there is imposed upon the proponent of a will the obligation of presenting evidence of volition, and before the question as to undue influence becomes one of fact for the determination by a jury, there must be evidence, the probative force of which establishes one, relations between the one charged with exercising the undue influence and the decedent affording the former an opportunity to control the testamentary act; two, that the decedent's condition was such as to permit of a subversion of his freedom of will; three, that there was activity on the part of the person charged with exercising undue influence; and four, that such person unduly profited as beneficiary under the will. It is also the law that evidence must be produced that pressure was brought to bear directly upon the testamentary act. None of these factors alone will create a presumption of invalidity, but in combination they make the question one of fact."
 "If you should believe that all of the circumstances of which I have instructed you are necessary to create a presumption of undue influence are present in this case, then you are instructed that the proponent has the burden of meeting that prima facie case, but it is sufficient if she produces just enough evidence to counterbalance the prima facie case, and it is not necessary for her to prove the absence of undue influence by a preponderance of the evidence."
NOTES
[fn. 1] 1. Listed by proponent in these words: "(1) The provisions of the propounded instrument are unnatural; (2) The dispositions of the instrument are at variance with the decedent's testamentary intentions; (3) The relations between the alleged wrongdoer and the decedent afforded to the former an opportunity to control the testamentary act; (4) The decedent's condition was such as to permit of a subversion of his freedom of will; (5) The alleged wrongdoer was active in procuring the instrument to be executed."
[fn. 2] 2. Contestant's Number 16 read as follows:
[fn. 3] 3. Contestant's Number 14 read as follows:
[fn. 4] 4. Proponent's Number 26 read as follows: