199 Cal.App.2d 630 (1962)
18 Cal. Rptr. 821
Estate of WALTER R. BLISS, Deceased.
FRANCES CROSBY, Contestant and Respondent,
v.
WILLIAM JAMES WILLIAMS, Petitioner and Appellant. Estate of WALTER R. BLISS, Deceased. HOWARD J. SHEEHAN, as Coexecutor, etc., et al., Plaintiffs and Respondents,
v.
WILLIAM JAMES WILLIAMS, Defendant and Appellant.
Docket Nos. 25613, 25614.
Court of Appeals of California, Second District, Division Four.
January 30, 1962.
*632 James D. Gunderson for Petitioner and Appellant.
Horowitz & Howard for Contestant and Respondent.
BALTHIS, J.
Two cases consolidated for purposes of trial are before us likewise consolidated for purposes of appeal.
The first is a contest of a will and the second is a complaint by the executors of the will to set aside an inter vivos gift made by the decedent to the proponent of the will. At the trial, pursuant to stipulation, the contestant, a niece of decedent, and the executors in the gift case were referred to as "plaintiffs," and the proponent of the will and defendant in the gift case was known as "defendant."
The decedent, Walter R. Bliss, died August 3, 1959, at the age of 83 and he left an estate in excess of $200,000 after having made a gift of approximately $76,000, the validity of which was challenged in the gift suit. A will dated March 24, 1959, left the residue of the estate in equal shares to William James Williams, the proponent and defendant, and to the four nieces (including the contestant Frances Crosby), and one nephew of decedent. A previous will dated August 12, 1958, left the estate (excluding a few specific bequests of personal property) to the nieces and nephew equally. The March 24, 1959, will was admitted to probate and thereafter the contestant Frances Crosby filed a petition for revocation of probate on the grounds (1) the testator was of unsound mind at the time the will was executed and (2) the testator was acting under the undue influence of the proponent William James Williams.
The executors named in the 1959 will, Howard J. Sheehan and Security-First National Bank, filed suit against William James Williams to have the gift to him in March 1959 of certain shares of stock set aside on the grounds that the gift was made at a time when the donor was of unsound mind and was the result of undue influence by donee upon decedent.
The proponent of the 1959 will and the donee of the gift, William James Williams (hereafter for convenience sometimes referred to as "defendant"), was a male nurse who took care of decedent in varying capacities from approximately May 1955 until the time of decedent's death.
The two cases were consolidated for trial pursuant to stipulation and thereafter tried by the court sitting without a jury. The court found (1) decedent was of unsound mind at the time the will was executed, (2) the will was the result of *633 undue influence practiced by defendant upon the testator and (3) the gift made to defendant by decedent was at a time when decedent was of unsound mind and acting under the undue influence of defendant. From the judgments in favor of contestant and the executors, defendant has appealed.
The principal question presented on appeal is whether or not there is substantial evidence to support the findings of testamentary incapacity and undue influence. Certain rules to guide the appellate court are, of course, elementary. [1] "The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case." (Estate of Bristol, 23 Cal.2d 221, 223 [143 P.2d 689].) Further, in reviewing the evidence all conflicts are resolved in favor of respondent and all legitimate and reasonable inferences are indulged in to uphold the finding or verdict of the trier of fact. (Estate of Lauth, 180 Cal. App.2d 313, 317 [4 Cal. Rptr. 764]; Estate of Bristol, 23 Cal.2d 221, 223 [143 P.2d 689].) The rule in its practical application is well stated in Estate of Bristol, supra, pages 223-224: "It is common knowledge among judges and lawyers that many cases are determined to the entire satisfaction of trial judges or juries, on their factual issues, by evidence which is overwhelming in its persuasiveness but which may appear relatively unsubstantial  if it can be reflected at all  in a phonographic record. Appellate courts, therefore, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical."
In the instant case a review of the evidence indicates that there is substantial evidence to support the findings made by the trial court. A summary of the evidence, construed most favorably for the plaintiffs here, is as follows: Decedent was a widower with no children. On October 10, 1950, decedent wrote to contestant telling her about the events immediately before and shortly after the death of his wife, and giving her the details of his new will. He stated that, other than a few personal items, his estate would be distributed among his four nieces and one nephew. He also asked her to disclose this information to the other named beneficiaries.
In May of 1954 decedent was a patient at St. Vincent's Hospital. He had surgery for cancer. Later that year, Frances *634 Crosby and her husband came to California. During that time she visited her uncle every day. He then knew he was the victim of cancer.
In May 1955 decedent first employed defendant Williams as his nurse. This was after decedent had been released from Hollywood Presbyterian Hospital. Shortly thereafter decedent needed a blood transfusion and was returned to the hospital, his appearance being that of a deceased person. Mrs. Crosby remained with decedent for two months. He became irrational about small things and without any factual basis thought she and her husband had rescued him from a Navy boat and put him on an Army boat. As a matter of fact, decedent seemed completely different in his personality in 1955 than he did in 1954 or at any time during which Mrs. Crosby had known him.
Starting with 1954, decedent's condition deteriorated. In 1954 it was physical and in 1955 it was both mental and physical. In January 1958 decedent was again hospitalized and the records of the Hollywood Presbyterian Hospital disclosed that he was suffering from cerebrovascular insufficiency due to cerebral arteriosclerosis, cancer of the prostate and senility. During October 1958 while defendant was off duty decedent fell on the floor of his apartment and was there most of the night unable to get up. Because of his condition he was admitted to Good Samaritan Hospital and the primary final diagnosis was a chronic brain syndrome; an additional diagnosis was cancer of the prostate. The discharge summary of October 29, 1958, states he was admitted because of a recent head injury, some loss of balance and personality changes.
On November 14, 1958, decedent entered Cedar Lodge Sanitarium where he remained until his death. In January 1959, Dr. Dean Pocock started to treat decedent. He described decedent as a chronically ill, elderly and senile individual who was known to have carcinoma of the prostate, a history of a stroke, a chronic urinary tract infection and a chronic brain syndrome. He had structural brain damage which would affect his behavior, personality, intelligence and coordination. He had personality changes and mental deterioration. He had a history of a cerebral vascular accident and a weight loss of 40 pounds over a four-year period.
Howard B. Henshey, an attorney who had known decedent for 25 years, had prepared a number of wills for him. The first of these was drawn on January 23, 1947, and the last on August 12, 1958. This last-mentioned will made no reference *635 to defendant. On January 27, 1959, defendant asked Mr. Henshey to come to the sanitarium. When he arrived he found decedent lying flat on his back barely able to move his lips to indicate whether or not he knew who was present. Henshey called defendant and asked what decedent wanted to see him about. Defendant told Henshey that decedent wanted to make a change in his will in order to leave defendant something. Henshey told defendant that he, Henshey, could not make a will for a man in decedent's physical condition and left.
Mr. Henshey was again summoned to decedent's bedside on February 2, 1959, for the purpose of drawing decedent's will. He found decedent in practically the same condition as on the prior date. Decedent could not answer his questions, so Henshey again told defendant that he could not draw a will for a man in that condition.
The first alleged gift of stock certificates took place on February 7, 1959, after decedent had returned from Good Samaritan Hospital on February 4 where he had been taken for a leg fracture. Surgery had not been performed to pin the fracture because decedent was physically unable to withstand surgery. A nurse, Arline Singleton, signed the stock certificates as a witness but did not see the face of the documents and did not know what she was signing.
On February 25, 1959, defendant took decedent to the Security-First National Bank. Decedent was very weak and was put in a wheel chair. At the bank decedent's safe deposit box was emptied of its contents which consisted of securities having a market value in excess of a quarter of a million dollars. These securities were taken to the sanitarium where they were placed in decedent's desk. Defendant states the securities were removed from the safe deposit box to the sanitarium because decedent thought in the event he needed money he would rather have the securities with him than at the bank.
Defendant testified that within five days after February 25, 1959, decedent gave him a number of securities. He said that decedent wheeled around his room in the wheel chair, opened the desk, took out the portfolio and picked out the securities he wanted defendant to have. Defendant further testified that when this occurred only he and decedent were in the room; that Arline Singleton witnessed decedent's signature to the securities but she was not in the room at the time decedent gave him the securities.
*636 Defendant caused the securities to be transferred to his own name. He put them in his own safe deposit box and by the time of the trial he had disposed of all of them. (The parties in the action stipulated that if the court should determine that plaintiffs are entitled to a judgment herein it should be for the sum of $76,705.45, in lieu of the return of such shares and of the dividends which would have been received thereon.)
Defendant subsequently employed one Kraker, an attorney, to prepare an affirmation of gift so that defendant's newly acquired stock would be protected. Kraker testified that he brought out the affirmation of gift, showed it to decedent, who looked it over and then signed it but not until after defendant told decedent that Kraker was a lawyer and had prepared an affirmation of gift "which is what you wanted me to do."
In connection with the preparation of the new will (executed March 24, 1959), defendant admitted seeing a copy of decedent's will of August 12, 1958, before decedent became a patient at the sanitarium. This 1958 will provided that certain personal items were bequeathed to specific persons and the residue was bequeathed to the nieces and nephew equally. Defendant called attorney Kraker and made all the arrangements with him regarding the preparation of a new will for decedent and which for the first time mentioned defendant as a beneficiary. Kraker testified he left a copy of the will he prepared with defendant Williams.
Between March 13 and 24, Kraker was at the sanitarium but was not able to talk to decedent. He was told decedent's condition had been quite bad and that defendant Williams did not want decedent to be aroused. Kraker talked with defendant on the telephone on March 16, 18 and 21. In those telephone conversations defendant stated that decedent had had a bad day or night, that he was in pain and under sedation, and Kraker admitted that it was his intention to wait for a time when defendant told him it would be a good time for him to appear and have the will signed.
The actual signing of the will was rather unusual. Kraker had two of his friends go to the sanitarium to be witnesses. They were introduced to decedent and Kraker testified that he then asked decedent if he had gone over a copy of the will which he (Kraker) had left. Kraker then took the original will out of his brief case and placed it in front of decedent. According to Kraker, decedent leafed through the will and *637 said it was "okay," and then signed it, whereupon the two witnesses signed. The will was not read aloud.
The court asked Mr. Naliboff, one of the two witnesses to the will, whether the will had been read to anyone and the witness said, "No." The court then asked whether the will had been read by decedent in his (Naliboff's) presence and he said he did not think so but did not remember. Naliboff also testified that he hesitated to state definitely whether decedent had noticed that it was a will because he (Naliboff) did not recall it specifically. Defendant Williams was in the room while the signatures were being affixed to the document.
During the entire time decedent was at the sanitarium (November 14, 1958, to August 3, 1959, the date of death) great quantities of drugs were administered to him  tranquilizers such as thorazine and equanil, sleeping pills and barbiturates. Dr. Pocock testified that during his visits at the sanitarium he noted that at times decedent appeared oversedated. The doctor testified that the chart indicated decedent received numerous tranquilizers and sedatives in an effort to keep him quiet because of his mental state. The doctor had informed defendant that equanil and barbiturates cause mental disturbances.
From the time Dr. Pocock commenced treating decedent he saw him with a frequency of from a couple of days to a week apart. In every way, decedent acted like a senile, deteriorated individual. Each time he went to the sanitarium Dr. Pocock observed the bedside notes with entries such as "talking incoherently," "disoriented," "confused," and the like.[1]
[2, 3] The doctor further testified it was his opinion decedent did not know the extent of his properties at any time; that, during the time he knew him, he did not see how decedent could have signed any business papers, a will or a gift  that is, he could have signed them but for him to understand *638 the significance of what he was doing was beyond his mental competence.
Mr. Howard Sheehan was decedent's friend for many years. It was his opinion that during the months of January, February and March of 1959, decedent was of unsound mind; that for five years before he died decedent was incapable, mentally, of transacting any business; that during the critical months mentioned he was never able to have any conversations with decedent.
As to the issue of testamentary incapacity, defendant Williams relies heavily upon the nurses' notes made March 23, 24 and 25 of 1959; these dates included the day of execution of the will as well as the days before and after. These notes have reference to decedent's condition as "alert and lucid." Defendant contends that the case is similar to Estate of Llewellyn, 83 Cal. App.2d 534 [189 P.2d 822, 191 P.2d 419]. In that case a judgment in favor of contestant, based upon a special verdict of the jury finding mental incompetency and undue influence, was reversed on appeal. The upper court relied upon the nurse's notes "mentally very clear" as describing testator's condition at the time the will was executed and applied the rule that evidence as to the testator's mental condition at the time the will is signed is controlling.
The Llewellyn case (83 Cal. App.2d 534) is distinguishable from the case at bar for a number of reasons:
(1) In the case at bar, the nurses' notes in question were made by defendant Williams and by Nurses Pegg and White. The trial court was entitled to regard the notes made by defendant Williams as self-serving. Nurse Pegg testified that in his opinion decedent was not mentally sound and that decedent was a senile, sick old man. When Nurse White was asked whether he had formed an opinion as to the mental condition of decedent, he refused to give such an opinion stating that a nurse does not form opinions. Finally, it is important to note that defendant made the admission that he did not make the bedside notes currently, but at the end of each day he would sit down and write up what happened during the day, and that this business of not making the notes currently was not at all infrequent. It is therefore evident that the trial court considered defendant's notes self-serving and otherwise not reliable.
(2) The description "alert and lucid" may have some reference to the patient's previous mental condition. One of the notes made by Dr. Pocock is "up in chair daily, clearer *639 mentally." [Emphasis added.] This has meaning only when comparison is made to his usual condition.
(3) The evidence here that decedent was in a serious state of mental decline during all of the months preceding the execution of the will is substantial and exceedingly convincing. The diagnosis of the Good Samaritan Hospital on October 16, 1958, was a "chronic brain syndrome." The testimony of Dr. Pocock, who attended decedent during the critical months of January, February and March 1959, and summarized above, is substantial and strong support for the finding that decedent was of unsound mind at the time the will was executed. During February, March and April the bedside notes of Cedar Lodge Sanitarium make numerous references to decedent's condition. There are 83 references to the fact that he was confused and disoriented; 21 references that he was lethargic or stuporous; 30 references to the fact that he was talking incoherently, irrational, unable to speak clearly, unable to speak, mumbling, and slurred of speech; 23 references to the fact that he was apparently comatose or semicomatose, showed signs of cynaosis, eyes open and staring, tremor in hands and arms, feeble, condition poor, condition guarded. The total of the above references is 157.
(4) In the Llewellyn case (83 Cal. App.2d 534, 560), the doctor attending the decedent testified that in his opinion the decedent was of sound mind; in the instant case Dr. Pocock testified exactly to the contrary.
(5) In the instant case, the attorney who prepared the will was a stranger who was brought in by the defendant; in the Llewellyn case the will was prepared by an attorney who had known the Llewellyn family, including decedent, for some 50 years. Also, in that case the will was read out loud to the decedent before he signed it.
In our opinion the findings made by the trial court in the case before us that the decedent was of unsound mind at the time the will was executed and at the time the gifts were made are fully supported by substantial evidence.
[4a, 5a] We also believe that the findings of undue influence in both cases are supported by substantial evidence. In Estate of Pellegrini, 138 Cal. App.2d 143 [291 P.2d 558], the court affirmed an order revoking probate of a will where there was substantial evidence that the proponent (1) sustained a confidential relationship to the testator, (2) unduly profited by the will and (3) actively participated in procuring its execution.
*640 In the instant case there was substantial evidence to establish all of three of these elements. The court found that a confidential relationship existed between decedent and defendant during all of the time decedent was a patient at Cedar Lodge Sanitarium. [6] Whether a confidential relationship exists is always a question of fact and must depend upon the circumstances of each case. [7] It may include the relationship of patient and nurse. [8] The relation and the duties involved need not be legal. They may be moral, social, domestic or merely personal. [9] The rule embraces both technical fiduciary relations and those informal relations which exist wherever one man trusts in and relies upon another. (See statement of rule, Bolander v. Thompson, 57 Cal. App.2d 444, 447 [134 P.2d 924].)
[4b, 5b] Defendant here, a nurse, was waiting upon decedent daily and was taking care of his physical needs and quite frequently acted for him in his business and property matters. By reason of decedent's serious physical and mental weakness, it was necessary for decedent to trust and rely upon defendant.
That defendant unduly profited by the will and from the gifts is clear and beyond question. The gifts of stock are equivalent to approximately $76,000. As a beneficiary under the will he would be entitled to one-sixth of the residue of decedent's estate.
Further, the evidence recited above establishes that defendant participated actively both in the preparation and execution of the will and the carrying out of the gifts of securities.
In view of the above, the rule of the Pellegrini case (138 Cal. App.2d 143) is applicable here; in that case, after reviewing the evidence, the court says at page 148, "This evidence supports an implied finding that the three elements recognized by the exception to the general rule (confidential relationship, undue profit, and active participation) were present here and gave rise to a presumption of undue influence. We, as a reviewing court, cannot say as a matter of law that this presumption was offset by other evidence in the case."
Defendant further contends on appeal that it was error for the court to consolidate the two cases for trial, one being a probate case and the other in equity. [10] The fact that there is a fundamental distinction between the law and equity jurisdiction of the superior court and its probate jurisdiction (a strictly limited one) would in no way prohibit the consolidation of a contested probate proceeding and an equitable action *641 for purposes of trial. The court has jurisdiction of both matters and the consolidation is made to save all parties money and time and is in the interests of a more practical and efficient administration of justice.
[11] Further, defendant is not in a position to complain of the consolidation because a written stipulation (executed on behalf of plaintiffs and defendant) that the equity action and the will contest "be consolidated for the purpose of trial only" was filed in both causes and the order was made pursuant thereto.
[12, 13] Defendant's final contention is that the court should have granted defendant's motions for judgment on the pleadings and for nonsuit. This argument is apparently based upon a technical point that the will incorporates or approves of the gift of the stock and the executors cannot attack the gift because of their duty to uphold the will. We believe this contention is technical only, has no merit, and is unsupported by any authority. The rulings of the trial court in denying the motions were correct.
For the reasons above set forth, the judgment in each of the consolidated cases on appeal is affirmed.
Burke, P.J., and Jefferson, J., concurred.
Appellant's petition for a hearing by the Supreme Court was denied March 28, 1962.
NOTES
[1] When asked his opinion as to the mental condition of decedent during the entire period of January 1 through March 31, 1959, Dr. Pocock stated as follows:

"I think I can in all honesty make the statement that during that period I wouldn't feel that this man at any time had the mental status to make decisions of a business nature, for example, or to be aware of his property or details of that nature. I think his awareness was limited during this period to at times the presence of individuals, his complaints whether he was hungry, whether he felt he needed a bowel movement, this sort of thing; but as far as being a person in a position to evaluate business decisions and this sort of thing, I would feel I could make the general statement that during that period in my opinion that he could not." (R.T. pps. 137-138.)