[Civ. No. 735. Fifth Dist. Dec. 11, 1967.]

Estate of BETTY R. DAVISON, Deceased. EMILIA AVILA et al., Plaintiffs and Respondents, v. LUPE R. WELD, Defendant and Appellant.

Lopez & Hill, Hyde & Olson and Richard L. Olson for Defendant and Appellant.

Richard E. Hawk for Plaintiffs and Respondents.

CONLEY, P. J.—After the filing of appellant's opening brief on March 28, 1967, the respondents obtained, through six successive solicited orders, an extension of time to file respondents' brief until October 6, 1967. No brief having been prepared by respondents within that extended period, notice was given by the clerk, pursuant to rule 17(b) of the California Rules of Court, that the case would be submitted for decision on the record, including appellant's opening brief, unless respondents' brief should be forthcoming within 30 days, or good cause for relief otherwise shown. Respondents' brief not having been filed within that period and no showing of excuse being made, the cause was ordered submitted for decision on the record, including appellant's opening brief, after appellant waived argument. While rule 17(b) states that in such circumstances ". . . the court may accept as true the statement of facts in the appellant's opening brief . . ." it is not incumbent on the tribunal to accept as binding any factual conclusion or inference sought to be imposed by the appellant. Failure of counsel to comply with the court rules may, and usually does, result in added work for the appellate justice to whom the case is assigned, and it is certain that in some instances the respondent is badly handicapped through the failure of his attorney to perform his duty in accordance with the rules of court. As a consequence of the default of the attorney for respondents, this court assumed the burden of reading the extensive transcripts in their entirety and of making an independent investigation of the law supplemental to appellant's treatment of the case.

The litigation involves an attack upon the document proposed as the last will and testament by Lupe R. Weld, the youngest sister of the decedent, Betty R. Davison, by three of the nine original siblings of the proponent. The attack was

initially based on two grounds, one the alleged lack of a sound and disposing mind and memory of Mrs. Davison at the time of the execution of the will, the other that Mrs. Weld exercised undue influence over the sick woman to induce her to leave everything to her. Although the claim of lack of capacity to formulate a will was in effect abandoned by the contestants, the trial court did set aside the testament on the ground of undue influence exercised by Mrs. Weld. In findings of fact preceding the decree, the court determined that Mrs. Davison died on October 15, 1964, and left an estate consisting of personal property in Fresno County, her place of residence; that a document dated October 14, 1964, was offered for probate as the last will of the decedent; that Mrs. Weld was the sister of contestants and of the decedent; that the latter was particularly fond of Amilia Avila, one of her sisters, and that the purported will ". . . was made as a direct result of undue influence exercised by Respondent," which consisted of the following:

"A. At the time of the execution of said document dated October 14, 1964, the Deceased was in a weakened physical and mental condition.

"B. That a confidential relationship existed between the Deceased and the Respondent, LUPE R. WELD.

"C. That the Respondent unduly profited by the will; (She being the exclusive beneficiary thereunder).

"D. That said Respondent actively participated in procuring the execution of the will.

"9. From said findings, the presumption of undue influence was raised, and the Court further finds that the Respondent has not met the burden to prove that said will was not adduced by her undue influence, but, on the contrary, the Court finds that said will was more the act of Respondent than that of the Deceased.

"10. Said document dated October 14, 1964, is not the valid will of the Deceased. The Deceased died intestate."

From a careful reading of the transcript, we have reached the conclusion that the trial court would have been justified in finding either way on the essential issue of the case, and that the decision of the trial judge is one peculiarly within the orbit of our trial system; the judge below heard the evidence, saw the witnesses, and necessarily gained a viewpoint as to their respective veracity and the weight to be given to their evidence, which is not entirely duplicated by the cold record. Furthermore, a trial judge in consider-

ing the evidence is not bound to believe that one side is all white and the other all black; such judge may legitimately accept portions of the evidence adduced by the respective sides and indulge in inferences based on evidence which either side of a controversy may produce or, in other words, accept portions of the testimony given by witnesses called by the two sides of a controversy if such evidence is not necessarily in direct contradiction. It is not the function of this court to adopt those portions of a record which are in conflict with the trial court's determination of the substantial facts. ■■■ The trier of fact is the sole judge of the credibility of witnesses and the weight of the evidence in a will contest just as in any other legal contest. The general applicable rules are thus stated in *Estate of Bristol*, 23 Cal.2d 221, 223-224 [143 P.2d 689] : ''The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. (*Estate of Snowball* (1910) 157 Cal. 301, 305 [107 P. 598] ; *Estate of Barr* (1924), 69 Cal.App. 16, 33 [230 P. 181].) The rule as to our province is : 'In reviewing the evidence . . . all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (Italics added.) (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict. The critical word in the definition is '*substantial*'; it is a door which can lead as readily to abuse as to practical or enlightened justice. It is common knowledge among judges and lawyers that many cases are determined to the entire satisfaction of trial judges or juries, on their factual issues, by evidence which is overwhelming in its persuasiveness but which may appear relatively unsubstantial—if it can be reflected at all—in a phonographic record. Appellate courts, therefore, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the

record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical. Upon such view of the law we cannot hold that any essential finding in this case is unsupported.''

This court said in *Estate of Wynne,* 239 Cal.App.2d 369, 372 [48 Cal.Rptr. 656] : ''The province of a reviewing court in a will contest is, of course, the same as in other civil cases —that is, if it finds that there is substantial evidence to support the trial court's findings, it must affirm *(Estate of Morgan,* 225 Cal.App.2d 156, 167 [37 Cal.Rptr. 160] ; *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689]). In reviewing the findings, it is our duty to accept all evidence which is favorable to the respondent, and if the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed *(Estate of Teel,* 25 Cal.2d 520, 527 [154 P.2d 384]).'' (See also *Estate of Miller,* 16 Cal.App.2d 154, 159-160 [60 P.2d 498] ; *Estate of Ramey,* 62 Cal.App. 413, 425 [217 P. 135] ; *Estate of Gill,* 14 Cal.App.2d 526 [58 P.2d 734] ; *Estate of Doolittle,* 153 Cal. 29 [94 P. 240] ; *Estate of Snowball,* 157 Cal. 301 [107 P. 598] ; *Estate of Cashion,* 27 Cal.App.2d 689 [81 P.2d 628] ; *Estate of Allan,* 15 Cal.App.2d 272, 277 [59 P.2d 425] ; *Estate of Arnold,* 147 Cal. 583, 586 [82 P. 252] ; *Estate of Webster,* 43 Cal.App.2d 6 [110 P.2d 81, 111 P.2d 355] ; *Estate of Ross,* 199 Cal. 641, 646 [250 P. 676] ; *Estate of Johnson,* 200 Cal. 299, 302 [252 P. 1049] ; *Estate of Russell,* 189 Cal. 759, 763 [210 P. 249] ; *Willman* v. *Gustafson,* 63 Cal.App.2d 830, 832 [147 P.2d 636] ; *Crawford* v. *Southern Pac. Co.,* 3 Cal.2d 427, 429 [45 P.2d 183] ; *Schmedding* v. *Schmedding,* 240 Cal.App.2d 312, 314-315 [49 Cal.Rptr. 523] ; *Taylor* v. *Wright,* 69 Cal.App.2d 371, 374-375 [159 P.2d 980].)

▆▆▆ The trial court found upon sufficient evidence that a confidential relationship existed between the decedent and Mrs. Weld. *(Campbell* v. *Genshlea,* 180 Cal. 213, 224 [180 P. 336] ; *Laherty* v. *Connell,* 64 Cal.App.2d 355, 362 [148 P.2d 895]) with the consequence that the burden of proving fairness of the transaction shifted to the proponent. *(Estate of Nutt,* 181 Cal. 522, 526 [185 P. 393] ; *Estate of Pellegrini,* 138 Cal.App.2d 143 [291 P.2d 558] ; *Estate of Llewellyn,* 83 Cal. App.2d 534, 561 [189 P.2d 822, 191 P.2d 419] ; *Nobles* v. *Hutton,* 7 Cal.App. 14 [93 P. 289] ; *Brison* v. *Brison,* 75 Cal. 525 [17 P. 689, 7 Am.St.Rep. 189] ; *Payne* v. *Payne,* 12 Cal. App. 251 [107 P. 148] ; *Estate of Miller,* 16 Cal.App.2d 141,

152 [60 P.2d 492] ; *Azevedo* v. *Leavitt,* 76 Cal.App.2d 321, 329 [172 P.2d 704] ; *Sparks* v. *Mendoza,* 83 Cal.App.2d 511, 514 [189 P.2d 43] ; *O'Neill* v. *Dennis,* 109 Cal.App.2d 210 [240 P.2d 376] ; 17 Cal.Jur.2d, Duress, etc. § 16, p. 86.)

■ As is said in *Estate of Bliss,* 199 Cal.App.2d 630, 640 [18 Cal.Rptr. 821] : "Whether a confidential relationship exists is always a question of fact and must depend upon the circumstances of each case. . . . The relation and the duties involved need not be legal. They may be moral, social, domestic or merely personal. The rule embraces both technical fiduciary relations and those informal relations which exist wherever one man trusts in and relies upon another."

■ The decedent, Betty Romo Davison, died at the age of 62 years on the 15th of October, 1964; she left neither a surviving spouse nor children and her parents were both dead. She was one of nine Romo siblings. The proponent of the contested will, Lupe Romo Weld, was the youngest child in the family. Until the proponent was 16 years of age, she had lived for a number of years with the testatrix and her deceased husband, Harry Davison, and again lived with the Davisons for over a year when she was 18 years old. Later, in 1949, the testatrix and her husband occupied the same house as the proponent and her family for a period over a year. After Mr. Davison's death in 1952, the testatrix also stayed with the proponent for about a year and a half. In 1953, Mrs. Davison moved into a home occupied by Frank Nunez, who was not related to her or to the Romo family; the Nunez home was about two blocks from proponent's home. During this period, the decedent accompanied the Welds frequently on Sundays to Hart's Restaurant or other restaurants on their way to or from church and the two women also went shopping together.

One of the witnesses for the contestants, a Maria C. Palumbo, stayed at the Nunez home at various times, but she moved to her own home in the month of August 1964. On September 26, 1964, Mrs. Weld visited Mrs. Davison at the Nunez home and found that she was ill. Mr. Nunez was also largely incapacitated as he had difficulty in moving up and down; he was crippled and could not cook very well for himself. Mrs. Weld removed the testatrix to her home two blocks away, apparently without asking whether that suited Mrs. Davison. The Welds' doctor, Kukio H. Taira, made a house call on September 28, 1964, and found Mrs. Davison weak and anemic. (53 Cal.Jur.2d, Wills, § 178, pp. 423-426.) Between

September 28th and October 14th, he saw her six or seven times at the Fresno Community Hospital and his treatment by blood transfusions tended to improve her condition, as it was thought. While the doctor had told Mrs. Weld that there was a possibility of cancer, he could not be sure without X-rays. The proponent's daughter wrote to the decedent's sister, Emilia, who is one of the contestants here, saying that the Welds were caring for her in their home and indicating that there was an improvement in the condition of Mrs. Davison; close relatives and friends were thus discouraged from ending the patient's isolation during her terminal illness. (53 Cal. Jur.2d, Wills, § 172, pp. 413-414.) During that period, Mrs. Davison talked with Mr. Nunez on the telephone and asked him to give the keys to her trunk to the Welds. Mr. Nunez agreed. Although some member of the Weld family went to the Nunez home almost every day, on one occasion moving Mrs. Davison's trunk and furniture from the Nunez house to the Weld house, no one offered to take Mr. Nunez to see her. On October 13, 1964, Dr. Taira secured the first X-ray pictures of Mrs. Davison at the Fresno Community Hospital, and this series of films was completed on October 14, 1964, at which time Dr. Taira reached the definite conclusion that Mrs. Davison was suffering from cancer of the pancreas; he informed Mrs. Weld of that fact and that her sister did not have long to live. Upon returning to the Weld home on that day, the proponent telephoned to the family lawyer of the Welds, Mr. Gilbert D. Lopez, at around 11 a.m., saying that Mrs. Davison wished to make a will and communicating the complete data for that purpose, stating, among other things, that Mrs. Davison desired to leave all of her property to Mrs. Weld and to name her as executrix. (53 Cal.Jur.2d, Wills, § 175, pp. 417-420.) Although Mrs. Davison would have been able to talk on the telephone, she took no part in the conversation. And the testatrix was wholly deprived, weak as she was, of any independent advice. (53 Cal.Jur.2d, Wills, § 176, pp. 420-421.)

Mr. Lopez, in his own office, directed his secretary, Terri Rieping, to typewrite a will specifying the format to be used and transmitting to her the data received by telephone from Mrs. Weld. At about 2 p.m. on the same day, Mr. Lopez and Mrs. Rieping went to the Weld home taking along a Stenorette tape recorder. He had been told by Mrs. Weld that the testatrix had only a short time to live, and Mr. Lopez considered it, as he said, "a death-bed will," (53 Cal.Jur.2d, Wills,

§ 179, p. 426) and wanted a record in case the question should ever arise as to who was directing the preparation of the will and whether or not Mrs. Davison understood what she was doing. He went through the entire will which he had prepared, explaining anything which was apparently not clear to the proposed testatrix. At the end, Mrs. Davison signed the will in a rather uncharacteristic and wobbly way; she had been propped up by pillows for the purpose, and during the whole period of time both Mr. and Mrs. Weld were in the room with her. She died within 21 hours afterwards, on the 15th of October, 1964. Nothing was left to any relative other than Mrs. Weld, who received everything and was named as executrix.

The *Estate of Lingenfelter,* 38 Cal.2d 571, 585 [241 P.2d 990], thus discusses proof of undue influence: "The indicia of undue influence have been stated as follows: '(1) The provisions of the will were unnatural . . . ; (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; and (5) the chief beneficiaries under the will were active in procuring the instrument to be executed.' (*Estate of Yale,* 214 Cal. 115, 122 [4 P.2d 153].) These, coupled with a confidential relationship between at least one of the chief beneficiaries and the testator, altogether were held 'sufficient to shift the burden to the proponents of the will to establish an absence of undue influence and coercion and to require the issues to be determined by the jury.' (*Estate of Yale, supra,* p. 123.)

"In *Estate of Graves,* 202 Cal. 258, 262 [259 P. 935], it was said that the following facts, among others, are recognized as indicative of undue influence: 'The relations between appellant and the decedent afforded to appellant an opportunity to control the testamentary act; the decedent's condition was such as to permit of a subversion of her freedom of will; the appellant was active in procuring the instrument to be executed. In addition, appellant unduly profited as beneficiary under the will. While none of these circumstances, standing alone, has the effect of creating a presumption against the validity of the instrument, their probative force, in combination, is to impose upon the proponent the obligation of pre-

senting evidence of volition, and to make the question as to undue influence one of fact for the jury's determination.' "

(See also *Estate of Bliss, supra,* 199 Cal.App.2d 630 ; *Estate of Nutt, supra,* 181 Cal. 522-526 ; *Estate of Gallo,* 61 Cal.App. 163, 175 [214 P. 496] ; *Estate of Yale,* 214 Cal. 115 [4 P.2d 153] ; *Estate of Olson,* 19 Cal.App. 379 [126 P. 171] ; *Estate of Pellegrini, supra,* 138 Cal.App.2d 143.)

■ Applying the foregoing indicia of undue influence to the case at bar, it would seem that the provisions of the will were unnatural in that the entire estate was left to a sole sister who by all of the evidence was not by any means the favorite of the decedent. (53 Cal.Jur.2d, Wills, § 56, pp. 289-290.) Mrs. Davison's sister, Emilia, who lived with a crippled son, had apparently been the closest to her of her sisters, and unquestionably was most in need of money or support for her family. She was one of the contestants, and letters received in evidence showed that she had been very close, and very dear, to the decedent. Other members of her family also were on affectionate terms with her and one would assume that at least some of them would have been remembered in part if the decedent had been uninfluenced at the time of making a final disposition of her property. The record also shows that Mrs. Davison had not expressed herself previously as desiring to leave all, or, in fact, any part of her property to this one sister ; there was some evidence that she and Mr. Nunez at one time had agreed to make mutual wills, each leaving his or her property to the other. The relations existing between the chief beneficiary and the decedent afforded to Mrs. Weld an overpowering opportunity to control the testamentary act; the decedent was very sick and weak and depended wholly upon the good graces of Mrs. Weld with respect to every element of her ebbing life. Certainly, the decedent's mental and physical condition were such as to permit a subversion of her freedom of will, and, without question, the sole beneficiary was wholly active in procuring the execution of the instrument, which gave everything to her. All of the elements going to make up undue influence mentioned in the *Estate of Lingenfelter, supra,* were present. The instant case, in one essential, is unlike that described in *Estate of Callahan,* 67 Cal.2d 609, 618-619 [63 Cal.Rptr. 277, 432 P.2d 965], recently decided by the Supreme Court. While in that case, there were facts which appeared ". . . sufficient to establish the presense herein of some of the indicia of undue influence, . . ." there was a total lack of proof that the influence of the beneficiary ". . . *was*

*brought directly to bear upon the testamentary act."* Here, there can be no question of the presence of that element.

It is argued by the respondent, in view of the testimony of a number of witnesses that the decedent at times did not get along well with the proponent and that Mrs. Davison had expressed herself from time to time as angry with, or indifferent to, her youngest sister, there could not possibly be a proper finding of confidential relationship as between them; however, evidence adduced by the proponent differed markedly from that just referred to, and the trier of fact was not strictly limited in his findings to evidence introduced by one side or the other. It was the sworn duty of the trier of fact to make findings based on the whole evidence no matter which side introduced it.

The trial judge filed a memorandum opinion relative to his decision, which is most pointed as to the factors considered by him and his reaction to the testimony:

"In making the Order denying the Will offered in the above-entitled proceeding of BETTY R. DAVISON for Probate, the Court has not been unmindful of decisional law appertaining to the peculiar status of the executed Will of a deceased person. However, the circumstances surrounding the making and execution of the subject Will are such that the Court has concluded that it does not reflect the testamentary act of Mrs. Davison.

"The deceased, widowed without children, had taken residence with one Frank Nunes and for a period of some fourteen (14) years, had shared his home. There is no evidence that the relation of these two people (who were growing elderly) was anything other than amicable. Moreover, such residence was but a short distance from the family residence of the proponent and was near that of an unmarried brother. The evidence also showed that her relations with her six other [living] brothers and sisters appeared to be normal, and the evidence seemed conclusive that she was particularly fond of her sister, EMILIA (Emy) who resided at Crockett, California, with her handicapped son.

"Nineteen (19) days before her demise, and at a time when Mr. Nunes had become quite infirm, proponent, with other members of her family, physically moved the ailing Mrs. Davison to their own home a couple of blocks away. This apparently was done without any request from the testatrix and contrary to the wishes of Mr. Nunes. In spite of the fact that the home of the proponent was then occupied by the

proponent, her husband, her son and his wife, and her daughter and her husband, and a grandchild, a room was provided for testatrix. A few days later, her bed, bed linens and other personal property, including a locked trunk, were removed in the same manner to proponent's residence. Mrs. Davison remained under the exclusive care and control of proponent during this entire period, with the exception of brief evening calls of her brother, DAVID, to say 'hello' and there appeared to be no contact of the testatrix with any members of her own family thereafter. One letter was written in behalf of the deceased by her niece telling other members of the family of her illness with the inference that she would soon be recovered.

"Testatrix was in a very weakened physical condition, and under the care of a doctor who was administering transfusions 'to build her up'. For these transfusions, she was taken to the hospital by proponent, where a series of X-rays were taken. A tentative and guarded diagnosis of cancer had not convinced proponent that her sister was suffering from anything more than 'stomach flu'. On October 13, the X-rays were completed and the deceased and proponent were told by the attending physician that the illness was terminal within a short period.

"About noon on October 14, proponent telephoned Mr. Lopez, her husband's attorney, and gave him directions to prepare the Will, which was later executed by the testatrix. Although Mr. Lopez had met the deceased, he had never represented her; the acquaintance was casual and he had no communication whatsoever with her until the execution of the instrument. About two hours after the telephone call, Mr. Lopez appeared at the residence of the proponent, accompanied by his secretary, who took the responsibility of having drafted the Will with some general directions given by Mr. Lopez, together with a Stenorette. With the exception of one clerical error, which had been made by the secretary, and was found on the way out to the proponent's house and changed by her, the Will was executed in the exact manner and condition under which it had been prepared. Surrounded · by members of the proponent's family, deceased was propped up on a sofa in the living room, upon which she was reclining. The Will was read and explained to her by Mr. Lopez and thereafter witnessed by Mr. Lopez and his secretary. The taped record of the conversation between counsel and the deceased is an exhibit in the case, and speaks rather clearly of

the conditions of the testatrix and the circumstances under which she signed the Will. The attempted dialogue between testatrix and the attorney was, in the Court's opinion, a poor substitute for a frank discussion between the maker and draftsman of a Will, in surroundings where the maker could voluntarily have given instructions for the preparation of such a document. Moreover, if proponent's efforts are to be given credence, there was no reason why the deceased could not have given the directions directly over the telephone herself to Mr. Lopez.

"The Court finds:

"(1) That a confidential relationship existed between the deceased and the proponent;

"(2) That the proponent unduly profited by the Will; (she being the exclusive beneficiary thereunder);

"(3) That proponent actively participated in procuring the execution of the Will.

"From these findings, the presumption of undue influence was raised, and the Court finds that the proponent has not met the burden to prove that the Will was not adduced by her undue influence but, on the contrary, shows that it was more the act of proponent than that of deceased.

"Although proponent maintained poise throughout the hearing, her manner in testifying, her evasiveness and her reluctance to amplify testimony surrounding the circumstances of the execution of the Will, weighed heavily in the Court's decision against proponent, and gave the setting a superficial, rather than genuine aspect.

"DATED: December 3, 1965.

"/s/ Kellas
Judge of the Superior Court"

It is evident to us that this case presents questions of fact which the trial judge in the course of this litigation was the only one wholly competent to decide, and that this court, even if it were disposed to do so, could not set aside the judgment of the trial court as to the facts; the judgment is supported by substantial evidence, including legitimate inferences from the testimony, and it cannot properly be overridden on appeal.

The judgment is affirmed.

Stone, J., and Gargano, J., concurred.