[L. A. No. 11409. In Bank.—October 19, 1931.]

In the Matter of the Estate of CHARLES YALE, Deceased. HAROLD L. YALE et al., Contestants and Appellants, v. WILLIAM E. BRIGGS et al., Proponents and Appellants.

Woodruff, Musick & Hartke for Contestants and Appellants.

Harry A. Chamberlin and Farrand & Slosson for Proponents and Appellants.

THE COURT.—Charles Yale died in the county of Los Angeles on September 6, 1927, at the age of eighty-one and leaving an estate of approximately $200,000. Two days later William E. Briggs, as the executor named therein, filed with the county clerk documents purporting to be the will of the decedent, dated August 21, 1927, and a codicil thereto dated September 3, 1927. On September 27,

1927, an order was made admitting the will and codicil to probate and letters testamentary were thereupon issued. By the terms of the will the sum of $100 each was bequeathed to a brother and certain nephews and the sum of $1,000 each to two other nephews of the decedent. The specific bequests to relatives did not exceed the sum of $4,000. The residuary estate was left equally to said William E. Briggs, a banker of Minneapolis, and Ralph B. Hardacre of Los Angeles. By the third cause of the will a debt owed to the decedent by Dr. Claude F. Peters, the decedent's attending physician, was released and forgiven.

The will nominated the Security Trust and Savings Bank as executor. By reason of the fact that Ralph B. Hardacre was one of its vice-presidents, the bank, being apprised before the death of the decedent that it had been named as executor, announced its refusal to act as such. The codicil merely substituted William E. Briggs as executor in the place and stead of the bank.

On January 13, 1928, the brother, an incompetent sister, and the nephews and nieces instituted a contest of the will and filed a petition for the revocation of the probate thereof on four grounds: (1) Want of testamentary capacity on the part of the decedent both as to the will and the codicil; (2) undue influence exercised over the decedent on the part of the two bankers and the physician; (3) fraud on the part of the three last named in the procurement of the will; and (4) lack of the formalities required by law in the execution of the instruments.

At the close of the contestants' case in chief, the court denied the proponents' motions for a nonsuit as to grounds (1) and (2) and granted their motions for a nonsuit as to grounds (3) and (4). At the close of the introduction of all the evidence the court granted a renewed motion for a nonsuit as to the second ground of contest and denied a similar motion as to the first ground. The proponents' motion for a dismissal of the contest as to the contestants Jennie Ethelyn Grisier and Richard Miller on the ground that they were not parties entitled to contest for the reason that they are children of a contestant, Mary J. Miller, a living sister of the decedent, was granted. The only issue presented to the jury was that of the testamentary capacity of the decedent. Special verdicts were returned

in favor of the contestants on this issue both as to the will and the codicil. A motion for a judgment in favor of the proponents, notwithstanding the verdict, was denied. A judgment embodying all of the foregoing rulings and on the verdicts was entered. A motion for a new trial on behalf of the proponents was granted on the ground of insufficiency of the evidence to support the verdicts.

Cross-appeals are presented. By the contestants: from that part of the judgment granting motions for nonsuit, and from the order granting a new trial. By the proponents: from that part of the judgment denying the motion for a judgment notwithstanding the verdict. The appeals involving the orders granting nonsuits as to grounds (3) and (4) and the dismissal of the contest as to the contestants Grisier and Richard Miller may be disposed of briefly. But the disposition of the appeals from the order granting the nonsuit on the second ground of contest, from the order denying the motion for judgment notwithstanding the verdict, and from the order granting a new trial, will require more extended discussion.

As above noted, the second ground of contest was that in the execution of the will and codicil the decedent was acting under the undue influence of the principal beneficiaries of the will, and that said instruments were therefore not the product of the decedent's free will.

The decedent had been engaged in the banking business for many years in Iowa. Late in 1900 he went to Los Angeles and continued to reside there until his death. He accumulated a fortune estimated some years before his death to be in the neighborhood of $500,000. The inventory and appraisement filed in the matter of his estate shows his property at that time to be of the value of approximately $200,000, consisting for the most part of securities of stable value. He appears to have been liberal with his relatives and friends. His desire for many years was to dispose of his property in such a way as not to require administration of his estate upon his death and he was always averse to the making of a will. His expressed intention was that whatever property he possessed should be disposed of by a so-called living trust. His relatives were numerous. The next of kin, however, consisted of a brother, Bruce Yale, residing in Minnesota; a sister, Mary

J. Miller, confined as a hopelessly insane patient at a sanatorium near Glendale, and some fifteen nephews and nieces, with all of whom he was on affectionate or at least pleasant terms. In 1924 he presented $1,000 to each of his nephews and nieces with the exception of the two who were left $1,000 in the will. Shortly before his death he forgave a debt slightly in excess of $25,000 owing to him by his brother Bruce, and he expressed solicitude for the future care and maintenance of his incompetent sister. When in business in Iowa he formed the acquaintance of the proponent William E. Briggs, who was an official in a Minneapolis bank. His friendship with Briggs was of a specially close and confidential nature.

In the spring of 1927 Mr. Briggs visited the decedent at Los Angeles. At this time Mr. Yale was in poor health and Mr. Briggs attempted to assist him in getting his affairs in shape, going so far as to prepare a list of his securities and a list of his relatives. Mr. Hardacre was an officer of the Security Trust and Savings Bank in Los Angeles where Mr. Yale kept his bank account and otherwise did his banking business. The friendship of the latter two arose and continued by reason of business relationship and was not social in character.

In May, 1927, when Mr. Briggs was in Los Angeles, the three men, Briggs, Hardacre and the decedent, visited the safe deposit vault in said bank where the decedent kept his securities. At this time the decedent presented to each of Briggs and Hardacre securities of the value of $10,000. The decedent had theretofore presented to Briggs money or securities to the value of about $5,000.

Before he left for Minnesota Mr. Briggs instructed Annie Jordan, the decedent's housekeeper, to notify Mr. Hardacre in case anything should happen to the decedent. On Friday, August 19, 1927, the decedent suffered a stroke, denominated by the physician as cerebral thrombosis, a clotting of the blood vessels of the brain. On that day he had been taken to the city by a business acquaintance, a bond salesman, and had visited his attorney, John H. Wellman, who had attended to the decedent's legal business for some thirteen or fourteen years. When returning to his home on a street-car the decedent had suffered the stroke. He was not entirely incapacitated thereby and refused on arriving

at his home to have a physician called. The housekeeper, however, being apprehensive of the decedent's condition, called Dr. Peters, respondent herein; also, following the instructions of Mr. Briggs, she notified Mr. Hardacre of the condition of the decedent. Dr. Peters had attended the decedent professionally from time to time since the fall of 1926. For many months prior to the stroke the decedent had been afflicted with myocarditis, chronic nephritis, arteriosclerosis, Parker's palsy and senility. He was also unable to control the action of his bowels and kidneys to such an extent that he required the attention of a child on the part of his housekeeper. Dr. Peters attended the decedent on the evening of August 19th or on August 20th, and prescribed the administration of sedatives to quiet the nerves of the patient. Mr. Hardacre went out to see the patient on Saturday evening, August 20th, and had a conversation with him with reference to the disposition of his property, the decedent still insisting that he desired to dispose of his property in trust. Mr. Hardacre stated to the decedent that it would be wise to have someone from the trust department of the bank come out and advise the decedent. Mr. Hardacre endeavored to locate a vice-president, who was the chief trust officer of the bank, on Saturday evening, but learned that said attorney was out of the city and would not return until the following Monday, but was advised by someone in the trust department of the bank that Mr. Chamberlin, an attorney who had transacted legal business for the bank, but who was a stranger to the decedent, might be available. Mr. Hardacre then arranged with Mr. Chamberlin to have the latter visit the decedent on Sunday, August 21st, and advise him with reference to his affairs. Mr. Chamberlin took his typewriter with him. Mr. Hardacre had preceded Mr. Chamberlin to the sick-room and spent a half hour or so with decedent before Mr. Chamberlin was presented to the decedent as the attorney who had been recommended by the bank to come out and advise as to the disposition or settlement of his affairs. During the conference that ensued Dr. Peters was in attendance and the decedent was in bed. Mr. Hardacre, for the most part, stayed in an adjoining room. The decedent expressed a desire to provide for a disposition of his property in trust, but on the advice of

Mr. Chamberlin consented to make a will. A draft was prepared there at the house specifying the bank as the executor. When the draft was completed the decedent was asleep and it was decided not to disturb him. Mr. Chamberlin took the draft to his office and had it retyped. About 3 o'clock in the afternoon he returned to the sick-room, the decedent was propped up in bed by means of a chair placed at his back with the assistance of Dr. Peters. The will was then signed, the nurse and Mr. Chamberlin subscribing as witnesses. The next morning Mr. Chamberlin delivered the will to an officer of the bank. On the same day, Monday, the decedent caused his housekeeper to request his attorney, John H. Wellman, to come out to the house for consultation. Mr. Wellman was unable to go that day but did go out on Wednesday and had a talk with the decedent, at which time the decedent told Mr. Wellman that he wanted him to write his will; that he had a will but was not satisfied with it and wanted to change it. The decedent was so agitated and weak at the time that Mr. Wellman declined to go ahead with the preparation of a will for the reason that, in his opinion, the decedent was not in a mental or physical condition to make a will at the time.

Some months before the fatal illness of the decedent Mr. Briggs had requested Mr. Hardacre to notify him if anything should happen to Charles Yale. Shortly after the decedent suffered the first stroke, Mr. Hardacre telegraphed and telephoned to Minnesota to Mr. Briggs notifying the latter of the decedent's condition. Mr. Briggs arrived in Los Angeles on August 30th and immediately took charge of the decedent's affairs, even going to the extent of having the decedent execute, under date of September 2, 1927, a general power of attorney in his favor and at the same time a special power of attorney authorizing Mr. Briggs to assign and set over to the Title Insurance and Trust Company all of the property of the decedent of whatever kind. On the same day a trust officer of that company was sent out to the home of the decedent upon information that Mr. Yale desired to execute a trust. Upon his arrival and his observation of the condition of the decedent, in the presence of Mr. Briggs, this officer refused to proceed further with the execution of the

trust on the ground that in his opinion the decedent was not mentally competent to transact business.

When the bank refused to act as the executor Mr. Hardacre immediately notified Mr. Briggs at Minneapolis of that fact by telephone, at which time it was agreed between the two men that Mr. Briggs should be substituted as executor in the place and stead of the bank. A codicil to that effect was prepared by Mr. Chamberlin and on September 3d was signed by the decedent, by his mark, Mr. Chamberlin and one of his office associates acting as the witnesses thereto. After Mr. Briggs arrived on the scene he took complete charge of the decedent's affairs, directed what should be done with reference to the decedent's properties, and went even to the length of endeavoring to prevail upon Seth Yale to keep the other relations away from the house. This he appears to have succeeded in doing to an unwarranted extent.

It is unnecessary to detail further the evidence on which the contestants rely as establishing a *prima facie* case of undue influence and thus demonstrate that the order granting the nonsuit as to this ground of contest was erroneous. It is enough to say that the record sufficiently shows that from the time the decedent suffered his first stroke until his death he was under the active and complete domination and control of the chief beneficiaries of the will or their agents. At the time the will was executed the attending physician, Dr. Peters, one of the chief beneficiaries, actively assisted in propping his patient up in bed so that he might sign the document. On the record before us we are satisfied that the following *indicia* of undue influence were present: (1) The provisions of the will were unnatural. It cut off from any substantial bequests the natural objects of the decedent's bounty; (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; and (5) the chief beneficiaries under the will were active in procuring the instrument to be executed. In addition to these *indicia* a confidential re-

lationship existed between at least one of the chief benefi-
ciaries of the will and the decedent. Altogether they
were sufficient to shift the burden to the proponents of
the will to establish an absence of undue influence and
coercion and to require the issues to be determined by
the jury. (See *Estate of Graves,* 202 Cal. 258 [259 Pac. 935] ;
*Estate of Relph,* 192 Cal. 451, 465 [221 Pac. 361] ; *Estate
of Nutt,* 181 Cal. 522, 526 [185 Pac. 393] ; *Estate of Baird,*
176 Cal. 381, 384 [168 Pac. 561] ; *Estate of Packer,* 164
Cal. 525 [129 Pac. 778] ; *Estate of Lavinburg,* 161 Cal. 536
[119 Pac. 915] ; *Estate of Ricks,* 160 Cal. 450 [117 Pac.
532] ; *Estate of Gallo,* 61 Cal. App. 163, 175 [214 Pac. 496] ;
26 Cal. Jur., p. 647 et seq.)

We must conclude, therefore, on the record here, that
the trial court erred in taking from the jury the issue of
undue influence and that the motion for nonsuit on that
ground of contest should have been denied.

 As to the propriety of the order granting the motion
for a new trial on the first ground of contest, viz., want
of testamentary capacity, the evidence was greatly in con-
flict. We do not feel disposed or required further to discuss
the evidence on this issue, contained in a voluminous record,
in order to demonstrate that the preponderance was one way
or the other or that a verdict for the contestants would or
would not be supported by sufficient evidence. All that
is necessary to say is that the case is so balanced on this
issue that it cannot be said that the trial court was guilty
of such an abuse of discretion as to require a reversal of its
order granting the new trial.

 On the appeal from the order denying the motion
for judgment notwithstanding the verdict, the contentions
of the proponents and appellants are equally without
merit. We cannot say that their motion for a nonsuit at the
conclusion of the evidence, made on the ground that the
contestants' showing on the issue of testamentary incapacity
was insufficient to entitle it to go to the jury, should have
been granted. There was substantial evidence in favor of
the contestants on this issue and the motion for a nonsuit
was properly denied. Furthermore, there is support for
the statement that a motion for judgment, notwithstanding
the verdict, will lie only when a motion for a directed verdict
has been denied, but should have been granted (sec. 629,

Code Civ. Proc.; *Estate of Fleming*, 199 Cal. 750 [251 Pac. 637]; *Cushman* v. *Cliff House*, 79 Cal. App. 572 [250 Pac. 575]), and it does not appear that a motion for a directed verdict was made by the proponents. But the power of the court to direct a verdict is, touching that state of the evidence, the same as the right of the court to grant a nonsuit at the conclusion of the evidence. (*Bannister* v. *Los Angeles Ry. Corp.*, 203 Cal. 427 [264 Pac. 756]; *Estate of Caspar*, 172 Cal. 147 [155 Pac. 631].) For the purpose of this case only, the record has been considered as though a motion for a directed verdict had been made and denied. However, the rule as to directed verdicts is not that a verdict may be directed whenever the evidence is such that upon motion the court would grant a new trial (*Estate of Caspar, supra*). On the contrary, the rule is too well settled to require a citation of authority that an order granting a new trial will not be disturbed except in the face of a clear abuse of discretion.

█ We are not convinced of the merit of the appeal from the order granting the nonsuit on the issue of lack of due execution of the testamentary documents. In fact this ground has not been stressed on the presentation of these appeals. Nor have the contestants, in our opinion, presented substantial evidence relating to the charge of conspiracy on the part of the chief beneficiaries under the will beyond that which may be said to cast a suspicion in their direction.

Neither in the motion for a new trial nor in the order granting the motion was there placed any limitation as to the issues to be affected thereby. Under these circumstances it has been held that the general order granting the new trial reopens all of the issues made between the parties and it may be said that an affirmance of the order herein would have that effect. Nevertheless, in order that the new trial may be directed only to the determination of the real and substantial issues in the case, viz., want of testamentary capacity and undue influence, an order should be made as to each appeal.

The orders granting the motions for a nonsuit on the third and fourth grounds of contest, viz., fraud and conspiracy, and lack of the formalities required by law in the execution of the instruments, are affirmed. The order

granting the motion for a nonsuit on the second ground of contest, viz., undue influence exercised over the decedent on the part of the chief beneficiaries of the will, is reversed. The order granting the motion for a new trial on the first ground of contest, viz., want of testamentary capacity on the part of the decedent, both as to the will and the codicil, is affirmed. The order denying the motion for judgment notwithstanding the verdict is affirmed.

Rehearing denied.