[Civ. No. 6867.   Fourth Dist.   Oct. 15, 1962.]

Estate of MARGARET E. LOCKNANE, Deceased. FRANCES H. WAINWRIGHT, Contestant and Appellant, v. MADELYN ENTRIKEN, as Executrix, etc., Petitioner and Respondent.

Frances H. Wainwright, in pro. per., and Edwin H. Armstrong, for Contestant and Appellant.

Heinly & Heinly, Heinly, Hewett, Rickles & Heinly and John T. Tucker, Jr., for Petitioner and Respondent.

BROWN, J.*—This is an appeal from a judgment of the court sitting without a jury denying a petition to revoke the probate of the will of Margaret E. Locknane, deceased. The testatrix died at the age of 79 years on June 4, 1959, leaving an estate of an approximate value of $38,000 consisting of a duplex which was devised to respondent and the remainder of the estate which was divided equally among the testatrix' four children, respondent, appellant, another daughter, and a son. The other daughter and the son did not join or petition or participate in the action.

Appellant, who lives in Kansas, did not appear personally at the trial, but was represented by counsel. The will in question was executed on February 24, 1958, prior to which time, in September 1957, respondent was appointed guardian of the person of the testatrix and the First National Bank of Orange was named guardian of her estate. The will was admitted to probate on July 3, 1959.

*Assigned by Chairman of Judicial Council.

Appellant alleged in her petition that the will was executed under undue influence of respondent and that the testatrix was of unsound mind. Thereafter, the court in its findings of fact and conclusions of law found that the testatrix had testamentary capacity, that she was not unduly influenced in the execution of her will, and that there was a confidential relationship between respondent and the testatrix.

For some time prior to September 1957 respondent lived in one unit of the duplex which was devised to her, and the testatrix lived in the other unit, and when the guardianship was established the testatrix moved in with respondent.

In November 1957 Dr. Mayes, D.O., was treating the testatrix and she was sent to a private rest home on his recommendation. The respondent and testatrix were dissatisfied with the treatment there and attempted to obtain the testatrix' release, without success, either from Dr. Mayes or the attorney for the guardian bank. Respondent then contacted attorney Samuel Hurwitz, who obtained the testatrix' release. Dr. Mayes was discharged and Dr. Rumph, M.D., was retained. In January 1958 the testatrix asked respondent to make an appointment with Mr. Hurwitz to discuss a new will, stating she would like to have the lawyer who helped get her out of the rest home make the new will. Respondent made an appointment with the attorney's secretary and on January 20, 1958, the testatrix and respondent visited the attorney's office. During this interview the attorney had his secretary make verbatim notes of the conversation. Under the belief that the testatrix had given the attorney the impression that she wanted the property divided equally among the four children, as was covered in a previous executed will years ago, the testatrix advised the respondent on the way home from the attorney's office that she was merely describing her property and not stating the way she wanted it to go. On January 22, 1958, respondent wrote to the attorney explaining the error and enclosed a statement written by the testatrix in her own handwriting, reading as follows: ''I want Madelyn to have my duplex and furniture at my death.''

On February 10, 1958, the attorney wrote that he would prepare the will and on February 13th he mailed the will to the testatrix advising that it be witnessed by a doctor, suggesting Dr. Musfelt, M.D., a psychiatrist.

On February 24th the testatrix and respondent went to see Dr. Musfelt who examined the testatrix for forty or fifty minutes; then she proceeded to execute the will, Dr. Musfelt and

a secretary witnessing the same. The will was mailed back to the attorney's office and he retained it in his custody until it was offered for probate.

Appellant's attorney filed her opening brief, replied to by respondent. Meanwhile, appellant discharged her attorney and filed her closing brief in propria persona in which she has made a personal appeal to this court, giving testimony which was not offered to the trial court and which this court cannot consider, as well as some argument with reference to the testimony of various adverse witnesses, together with 17 exhibits consisting of various letters which cannot be considered in this case as they were not introduced in evidence in the court below. Failure of the appellant to testify in person or by deposition does not permit appellant to attempt to offer various exhibits or testimony before the appellate court. We are bound by the record. (*Datta* v. *Staab*, 173 Cal.App.2d 613 [343 P.2d 977]; *Firemen's Ins. Co.* v. *Indermill*, 182 Cal.App. 2d 339 [6 Cal.Rptr. 469].) California Rules of Court, rule 5,* states what the record shall consist of, and application to produce evidence must be made under rule 23(b)** of those rules. No such application has been made. The appellant appeals from the judgment claiming (1) that there was a presumption that the physical and mental deterioration of the decedent prior to the execution of the will continued to the time of making of the will and that the presumption was not overcome; (2) there was a confidential relationship between the decedent and respondent which raised the presumption of undue influence which presumption was not overcome; and (3) that there was a variance in the terms of the will and the expressed intentions of the testatrix.

As stated in *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183], the general rule is that when a judgment is attacked as being unsupported by substantial evidence, the only question before a reviewing court is whether there is substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trial court. (See also *Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689].)

The admission to probate of the will executed February 24, 1958, here in question ". . . established *prima facie,* for all the purposes of the contest, that it was duly executed in the manner required by law by a testator who was compe-

*Formerly Rules on Appeal, rule 5.
**Formerly Rules on Appeal, rule 23(b).

tent, free from undue influence, etc. The burden of proof was on the contestants to establish its invalidity." (*Estate of Baird*, 176 Cal. 381, 384 [168 P. 561]; *Estate of Jamison*, 41 Cal.2d 1 [256 P.2d 984].)

Where the contestant establishes a prima facie case of the absence of testamentary capacity, the proponent of the will has the burden of meeting it. "Testamentary capacity is always presumed to exist until the contrary is established, and the ultimate question is what was *actually* the testator's mental state at the time of the testamentary act, and not what it *may* have been." (*Estate of Russell*, 80 Cal. App.2d 711, 715 [182 P.2d 318].)

In *Estate of Bourquin*, 161 Cal.App.2d 289, 297 [326 P.2d 604], it was held: "It is not within our province to here decide whether the testatrix was competent to execute the will dated June 13, 1956. That question is one of fact for the trial judge."

In *Estate of Teel*, 25 Cal.2d 520 [154 P.2d 384], at page 526, the court said: "The trier of fact is the sole judge of the credibility and weight of the evidence in a will contest the same as in any other case."

While in the present case the testatrix was 79 years of age and in feeble health, these facts are not sufficient to establish testamentary incapacity unless it be shown by a preponderance of the evidence that a condition of mind and body at the time of the execution of the will was such that she was unable to understand the nature and situation of her property and the disposing of it intelligently or was unable to keep in mind the natural objects of her bounty. (*Estate of Russell*, *supra*, 80 Cal.App.2d 711.)

The testatrix weighed only 80 pounds, had suffered a small stroke, and there is testimony that when she got out of the rest home for the first time she walked the floor in an agitated state and even threatened suicide at the sanitarium.

It was stated in *Estate of Perkins*, 195 Cal. 699 [235 P. 45], at pages 703-704, that:

"Every mental departure from the normal will not destroy a testamentary disposition, otherwise valid, of the testatrix' estate. It is not the rule of law that no person who is insane may make a valid will. The real rule is that the will of a person, who by reason of insanity is incapable of making valid testamentary disposition of his estate, shall not be upheld [citations]. Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity

of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. Even in the latter class of cases, it is not sufficient merely to establish that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was the creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument.''

Mental departures from the normal are also discussed in the *Estate of Wright*, 7 Cal.2d 348, 356 [60 P.2d 434] ; *Estate of Smith*, 200 Cal. 152, 158 [252 P. 325] ; and *Estate of Nolan*, 25 Cal.App.2d 738, 741 [78 P.2d 456].

It is stated in *Estate of Gagliasso*, 150 Cal.App.2d 65, 70 [309 P.2d 513], that, ''The incompetency to make a will must be shown to exist at the very time of the will's execution.''

Evidence of the testatrix' mental status, appearance and conduct before and after the execution of the will is admissible as long as it has a reasonable tendency to indicate the mental condition at the time of the execution of the will, which also includes permanent and progressing mental disease. (*Estate of Calway*, 196 Cal.App.2d 268, 273, 274 [16 Cal.Rptr. 462] ; *Estate of Hartley*, 137 Cal.App. 630, 633 [31 P.2d 240].)

According to the testimony of Attorney Hurwitz, called by appellant, he questioned the testatrix in his office and had his secretary make a stenographic verbatim record of what was said. Several days later in her own handwriting the testatrix made a written request to have her will provide that the duplex was to be devised to respondent.

Dr. Musfelt, appellant's witness, testified about the condition of the testatrix and about her age and said that there were certain instances where she was forgetful. He stated as to undue influence that, ''I didn't think she had been at that time.'' He testified that she was most specific about the duplex and that, ''It was mainly what she was making the will for, to provide a home for her daughter''; that there could have been a personality change, a memory defect but that ''she was not psychotic'' and that she was of sound mind at the time she executed the will sufficient to make the will. He examined her for forty or fifty minutes and followed certain standards in determining the soundness of mind, which in this case included asking the testatrix if she knew this was a will and that she was signing it, what she

was disposing of and whether or not she wished to so dispose of it.

Appellant called several other witnesses who testified with respect to the condition of the testatrix before and after the execution of the will. Dr. Mayes testified that he had not seen her since December 3, 1957; that he was giving her tranquilizers at that time and that he had no opinion as to the soundness of her mind at the time the will was executed. Blanche Runbeck testified that she had not seen the testatrix since Christmas 1957 and that the testatrix was forgetful. Pleasant Tarvin testified that she had not seen the testatrix since August 1957 and as to the question of unsoundness of mind said, ''That is quite an assertion to make; I wouldn't say that,'' but she thought the testatrix was becoming senile. Hattie Estes testified to the question of unsound mind, ''I would say so,'' but would not say that the testatrix was insane on the day she last saw her. Emma Arnold would not say that the testatrix was insane and in fact, had no opinion as to her mental condition in February or March 1958. Martell Thompson, an attorney, testified that in his opinion the testatrix was of unsound mind in September 1957.

The respondent called, in addition to herself, two other witnesses, one, a licensed vocational nurse who had cared for the testatrix from January 1958 to her death two or three times a week, who stated that after the testatrix was released from the rest home she was peppy, gained weight, had pride in her appearance, was alert and had mentioned to the witness that she was grateful to respondent and hoped that she would be able to do something for her. This nurse was of the opinion that the testatrix was perfectly sane but did go down-hill after a July 1958 illness but that she was of sound mind. The other witness was a former daughter-in-law of respondent who testified that she had known the testatrix since 1952, that she saw her after her release from the sanitarium which was in December 1958, that the testatrix at that time stated that she was going to give the duplex to respondent, saying, ''I am glad she likes it because it is going to be hers someday. . . . I want Madelyn taken care of.'' She testified that the testatrix had a firm but stubborn mind and that the testatrix was not capable of being influenced.

The respondent testified as to the financial positions of her brother and sisters, which testimony was uncontradicted in the trial except that appellant has made an attempt in her closing brief to bring before us matters outside the record regarding the financial condition of these relatives. With respect to the

will, the respondent testified that it was at the testatrix' suggestion that they go to Mr. Hurwitz; that the testatrix told respondent that no one was interested in doing anything for her but respondent and she wanted respondent to have her home (the duplex), that she was going to change her will and that she would like to have the lawyer who helped her get out of the rest home prepare a new will. Respondent testified that she called Attorney Hurwitz or his secretary for the will appointment at the request of the testatrix; that she took testatrix to the attorney's office; that after the consultation as they walked home the testatrix said that she thought the attorney was trying to figure out how the balance of the property was to be left, excluding the duplex, and that she had misunderstood him; that the testatrix thereafter wrote a note in her own handwriting to the attorney to make the will so that the respondent would get the duplex. Thereafter, at the suggestion of Attorney Hurwitz in connection with the witnessing of the will, and at the request of the testatrix, the respondent called Dr. Musfelt and an appointment was made. The respondent testified that on the discharge from the sanitarium the testatrix said she wanted respondent to have the duplex; that the respondent had never asked the testatrix to give the duplex to her. It was respondent's opinion that the testatrix knew what she was doing on the day the will was signed. She denied retaining Attorney Hurwitz to prepare the will, but did admit retaining him for advice in connection with the guardianship matter previously. Respondent also denied using any influence to have the will of February 24, 1958, signed.

The court found that there was a confidential relationship existing between the testatrix and the respondent, but also found that the respondent did not exert any undue influence upon the testatrix at the time of the execution of the will. (See *Estate of Pellegrini,* 138 Cal.App.2d 143 [291 P.2d 558] ; *Estate of Bliss,* 199 Cal.App.2d 630 [18 Cal.Rptr. 821].)

The *Estate of Lingenfelter,* 38 Cal.2d 571, 585 [241 P.2d 990], outlines the factors involving undue influence as follows:

"The indicia of undue influence have been stated as follows: '(1) The provisions of the will were unnatural. . . . (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control

the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; and (5) the chief beneficiaries under the will were active in procuring the instrument to be executed.' (*Estate of Yale*, 214 Cal. 115, 122 [4 P.2d 153].) These, coupled with a confidential relationship between at least one of the chief beneficiaries and the testator, altogether were held 'sufficient to shift the burden to the proponents of the will to establish an absence of undue influence and coercion and to require the issues to be determined by the jury.' (*Estate of Yale, supra,* p. 123.)''

''Confidential relationships'' are defined in *Estate of Cover,* 188 Cal. 133, 143 [204 P. 583]. (See also *Herbert* v. *Lankershim,* 9 Cal.2d 409, 483-484 [71 P.2d 220], where the court approves of an instruction regarding a confidential relationship.)

In *Estate of Llewellyn,* 83 Cal.App.2d 534 [189 P.2d 822, 191 P.2d 419], the court said at page 564:

''And the evidence must indicate more than general influence. The influence necessary to invalidate a testamentary document must be a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made. . . .''

The court, in *Estate of Hull,* 63 Cal.App.2d 135, 143-144 [146 P.2d 242], stated:

''The burden was on the contestants to show undue influence, and in meeting that obligation it is not sufficient for them merely to show circumstances consistent with the exercise of undue influence, but before a duly and solemnly executed will can be invalidated, circumstances must be shown that are inconsistent with freedom of action on the part of testatrix.''

We think that there was not sufficient evidence to show on behalf of the contestant that even though the respondent was in a confidential relationship with the testatrix that she, as a matter of law, influenced the testatrix into leaving respondent the duplex. The evidence shows substantially that while the confidential relationship did exist, there was no coercion, no destroying of the free agency on the part of the testatrix, and no pressure brought to bear on the testamentary action.

''Proof of opportunity to influence the making of the will, even coupled with an interest or motive to do so, is insufficient.'' (*Estate of Robbins,* 172 Cal.App.2d 549, 554 [342 P.2d 933]; *Estate of Trabucco,* 192 Cal.App.2d 643, 645 [13 Cal. Rptr. 468].)

The *Estate of Gleason,* 164 Cal. 756 [130 P. 872], held that there must be a pressure which overpowered the mind and bore down the volition of the testatrix at the very time the will was made, if a will is set aside on the ground of undue influence. (See also *Estate of Arnold,* 16 Cal.2d 573, 577 [107 P.2d 25].)

In the memorandum opinion of the judge in the lower court, which we can use only for the purpose of determining what was in the mind of the court, he said that he believed the testatrix had recognition of the natural objects of her bounty; that the respondent was unmarried and unprovided for otherwise as compared with the other children; that at various times the testatrix had declared to others that the respondent should and would have the duplex; and that respondent had overcome the presumption of undue influence.

The testimony of Dr. Musfelt as to undue influence as set out hereinabove is not sufficient to support appellant's position as against the finding that there was no undue influence exercised. The devise to the respondent was not necessarily unnatural, nor is it unusual for a parent to provide for a child who has no other source of income and who is devoting all of her time, care and attention to the aged parent while the other children of the parent have gone their separate ways. In this case the respondent testified that she had received nothing for services nor did she plan on filing any claim against the estate for services. The trust officer of the guardian bank testified that respondent was receiving $110 per month from the guardianship account which was for the support of the testatrix.

We think the trial court was justified in finding from the evidence that the provisions of the will were not unnatural and that the disposition was not at variance with the intentions of the testatrix and believe that the testatrix' mental and physical condition was not subverted and that the chief beneficiary was not active in procuring the instrument to be executed.

The judgment is affirmed.

Griffin, P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied November 8, 1962, and appellant's petition for a hearing by the Supreme Court was denied December 12, 1962.